## MONTGOMERY v. PHILLIPS PETROLEUM CO. et al.

### No. 3806.

Court of Civil Appeals of Texas. Amarillo.

May 4, 1932.

Rehearing Denied May 25, 1932.

Stone & Guleke, of Amarillo, for appellant.

Morgan, Culton, Morgan & Britain, Underwood, Johnson, Dooley & Simpson, Cooper & Lumpkin, Don Emery, and Walter L. Barnes, all of Amarillo, and H. E. Oakes, of Panca City, Okl., for appellees.

HALL, C. J.

The appellant, Montgomery, sued Phillips Petroleum Company, Southland Royalty Company, Sneed Royalty Company, W. E. Herring and Less K. Johnson, as independent executors of the will of C. T. Herring, deceased, the Johnson Ranch Royalty Company, and numerous individuals interested in the Johnson Ranch property, praying that he have judgment against all of the defendants fixing and establishing a lien upon certain oil and gas leaseholds to secure him in the payment of certain sums of money therein alleged to be due him, and also prayed in the alternative for a personal judgment against said defendants for the said sums of money.

The defendants answered, demurring generally to the pleading.

The court sustained the general demurrer, and, upon Montgomery's refusal to amend, judgment was rendered accordingly.

Plaintiff's petition is quite lengthy, but the material facts alleged we state briefly as follows:

He alleges that May 29, 1919, E. B. and Ben F. Johnson, who owned many sections of land in Hutchinson county, executed and delivered to him an oil and gas lease covering about 22,000 acres of what is referred to as the Johnson ranch. That the primary term of said lease was five years from its date, and provided that it should exist as much longer thereafter as either oil or gas was produced from the premises. Montgomery paid approximately $1 per acre cash as consideration for the lease. It is further alleged that during the year 1920 Montgomery, in writing, executed four separate assignments, conveying to W. R. Ramsey certain tracts of land covered by the original lease, in which all of the tracts involved in this suit were included. These assignments recite a consideration of $50 per acre paid and secured to be paid by Ramsey by a payment of $10 in cash and the remainder of approximately $40 per acre payable out of the proceeds of one-half of the first oil and gas produced, either in oil or in cash. That the land involved in this suit was valuable for the production of oil and gas, although there had never been any development upon the particular property thereinafter described. The tracts involved are described as the W. ½ of the S. E. ¼ of section 2, block 1, Brooks & Burleson surveys; the N. ½ of the same section; section 16, block X03, John H. Gibson, original grantee; and the W. ½ of section 3 of said block 1, Brooks & Burleson surveys. That, in each of the said assignments, Montgomery reserved an overriding royalty of approximately $40 per acre to secure him in the payment of the consideration for said assignments. That on June 3, 1924, E. B. Johnson and others, as the owners of the fee, sued Montgomery, Ramsey, and other sublessees and assignees in the district court of Hutchinson county, to terminate and cancel the lease of May 29, 1919, in so far as it covered the lands therein described, except eight sections around two gas wells, which had been drilled by assignees of Montgomery prior to the expiration of the primary term of the original lease. This case was tried in the district court and was appealed to the Seventh Court of Civil Appeals and the judgment affirmed. Johnson v. Montgomery, 31 S.W.(2d) 160, 161.

That on or about October 31, 1925, Ramsey and his associates made an agreement with the Johnsons, the owners of the Johnson ranch, settling the above-mentioned lawsuit in so far as fourteen tracts of lands, including the three tracts above described, then owned by Ramsey and his associates, are concerned. That pursuant to the execution of this settlement agreement, E. B. Johnson and others, as lessors, executed and delivered to W. R. Ramsey, as lessee, nine separate oil and gas leases, three of which covered the above-described tracts of land, each of said leases being for a term of five years from October 31, 1925, and as long thereafter as oil or gas was produced in paying quantities by the lessees. That in October, 1925, at about the same time that the nine new leases were executed and as a part of the settlement agreement with the Johnsons, Ramsey and his associates executed and delivered to the Johnsons releases of the original 1919 oil and gas lease, in so far as said lease covered the fourteen tracts then leased to Ramsey, including the three tracts of land specifically described above. The land so released was the same property covered by the nine new oil and gas leases dated October 31, 1925.

It is further alleged that on January 26, 1926, and immediately after Ramsey had settled the lawsuit above mentioned with Johnson and others by taking the nine new oil and gas leases, Montgomery contended that said new leases should be subjected to his claim for additional consideration out of oil or in cash reserved by him in his assignments to Ramsey and associates, made in 1920, or that Ramsey and his associates and assignees should pay Montgomery the amount of the deferred consideration, in cash.

Subsequent to the execution of the settlement contract of January 26, 1926, three of the nine tracts of land included in the leases of October 31, 1925, to Ramsey, as lessee, were assigned and conveyed by the assignees of Ramsey to appellee Phillips Petroleum Company.

The settlement contract of January 26, 1926, which was signed by George E. Montgomery, W. R. Ramsey, and other sublessees and assignees under Ramsey, recites, among other things, that on May 29, 1919, the Johnsons executed and delivered to Montgomery an oil and gas lease upon 22,400 acres of land in Hutchinson county; that he had assigned his interest thereunder, reserving as a part of the consideration for the assignment the payment of various sums of money out of one-half of the first oil or gas produced from the premises, and described five tracts of land, parts of the Johnson ranch. The instrument further recites that, whereas the lease of May 29, 1919, executed by the Johnsons to Montgomery, has been the subject of litigation between the parties in an effort to cancel the same upon the ground that the lease had expired, and that, whereas the title of the several parties mentioned in said lease had been and is now in doubt: "And it is the desire of the undersigned parties of the first part to settle the litigation to perfect their title to the oil and gas mining rights upon the above mentioned tracts of land and each of same and the undersigned George E. Montgomery has a claim in and to said oil and gas lease in so far as the sums of money above mentioned are concerned and also has claimed and is claiming a personal liability for the said sums of money above mentioned for failure to drill and develop said premises during the terms of said lease and subsequent thereto, and whereas, the parties of the first part have entered into an agreement and settlement with the plaintiffs in the litigation referred to by, through and in the name of W. R. Ramsey, whereby plaintiffs have agreed to dismiss the action for the cancellation and termination of said oil and gas lease upon the agreement of W. R. Ramsey to drill a well for the production of oil or gas, to accept nine separate oil and gas leases covering the land hereinabove described executed by the proper fee owners and royalty owners in favor of W. R. Ramsey, as lessee, which leases bear a term of five years and as long thereafter as oil or gas is produced, and other considerations not necessary to mention herein; and, whereas, the parties hereto desire to settle any claim, cause of action or personal or individual liability for the payment of money from the above mentioned original assignments, and also to fix and establish the rights of second party, George E. Montgomery, in and to any oil and gas which may be produced from the premises."

The contract further recites "the payment of $4,000.00 in cash to Montgomery and that it is agreed that Montgomery, by said instrument, releases the parties of the first part from any and all personal or individual liability existing by reason of the assignments and contracts thereinbefore particularly described, and releases said parties from all claims, demands, and causes of action which may have accrued or which may hereafter accrue to him" (Montgomery) "against said parties, based upon or arising out of the terms, provisions and conditions of said assignments and each of them, and does hereby release any right, title or interest which he may have under the original oil and gas lease of E. B. Johnson and others to George E. Montgomery first referred to herein under the assignments severally described above and on the lands therein mentioned, in so far as said first parties above mentioned and their assigns and successors are concerned, and does hereby agree by and with the said plaintiffs and each of them that, in full discharge, satisfaction and release of all claims under said original contracts of assignment he will accept, and hereby agrees to accept the sum of $40.00 per acre to be paid out of the oil or gas produced from the said leased premises, if, as and when produced, it being expressly understood and agreed that this contract and agreement does not bind or obligate, by implication or express understanding, the first parties or their assigns or successors, to develop said premises or any of them for oil or gas, but in the event oil and gas, or either of them, is produced from the said premises and marketed therefrom, the said George E. Montgomery shall be entitled to the proceeds of seven-sixteenths of all oil produced from the premises until the sum of $40.00 per acre shall have been paid to the said George E. Montgomery out of said production from any lease."

The contract further recites: "This agreement is further executed under the consideration and agreement on the part of W. R. Ramsey that he has commenced work for the drilling of one well for the production of oil and gas upon one of the nine leases which he may or has received for himself and parties of the first part from the fee owners and royalty owners of the above described lands, but it is understood that the liability of the said W. R. Ramsey or first parties, shall not increase or create any obligations whatever to develop or operate the tracts or either of them covered by the several leases for oil or gas, or to dispose of either of such products, nor shall any such obligation be implied for the purpose of realizing to the said George E. Montgomery said sum of money or any part thereof and no liability shall result from the failure of the said W. R. Ramsey, or the other first parties herein, to develop or operate said tracts or any of them or the lands mentioned in the several nine

leases so to be received by the said W. R. Ramsey, J. H. Everest, E. E. Gibbens, R. E. Armstrong, I. Mary Bonner, The Glenwood Corporation and Peter W. Goebel, and this agreement shall not have the effect to enlarge the obligations imposed by said lease, nor to abridge or restrict the rights and privileges incurred thereby, including the right to surrender."

After setting out the settlement agreement in full, plaintiff further alleged that, in pursuance to the agreement, Ramsey and Armstrong surrendered their leasehold interest October 31, 1925, and new leases were executed to Ramsey covering the lands involved herein and other lands, said leases to remain in force for five years and as long thereafter as oil or gas or either was produced in paying quantities. ·

That, while said leasehold estate was in full force and effect, the Phillips Petroleum Company entered into an agreement with the Johnsons, the owners of the fee and the royalty interest, whereby it was stipulated, in substance, that, in consideration of the payment of $7,400, the Johnsons would, on or within ten days after November 1, 1930, execute and deliver to the Phillips Petroleum Company an oil and gas lease covering the premises described therein. That said leases should be in form a producers' 88, for a term of five years from October 31, 1930, and should provide for an annual delay rental in lieu of drilling in the sum of $1 per acre, etc. That thereafter, on November 10, 1930, the land and royalty owners executed leases to the Phillips Petroleum Company as provided in the contract previously executed.

Plaintiff then alleged: "That all the transactions and dealings between the grantors in the last mentioned oil and gas lease, the Phillips Petroleum Company were in fraud and derogation of the rights of the plaintiff herein in and to the purchase money charges against the respective leases herein referred to, and were entered into while the said first leases procured by Phillips Petroleum Company were in full force and effect and were entered into for the express and wrongful purpose of destroying the liens, equities, interest and estate of the said George E. Montgomery in and to said respective oil and gas leases, and were entered into in contemplation of the fact by and between all the parties thereto, with the express and implied understanding that · the Phillips Petroleum Company was not surrendering or relinquishing said respective leases, but with the sole and main purpose of the said Phillips Petroleum Company and said grantors in said last mentioned leases in an attempt to remove from said leases the charges, interest, liens and equities of the said George E. Montgomery, when in truth and in fact, the said Phillips Petroleum Company held such leases in the capacity akin to that of a trustee for the ben-

efit of the said George E. Montgomery, so far as his interest existed and as above set forth, and each and all of the defendants so knew and understood such to be the fact, and by reason thereof each and all of said parties had participated in and induced the breach of trust owing by themselves to the said George E. Montgomery, and that inasmuch as said leases have never been in truth and in fact terminated, and the oil and gas leasehold estate and interest of the said Phillips Petroleum Company has never terminated, the new leases taken by them should in law and in equity be charged with and held subject to the payments provided for in the contract above set forth between the said Ramsey and the said Montgomery."

By his first proposition the appellant, Montgomery, insists that, because he assigned part of his lease to Ramsey and others, and as part consideration therefor, the assignees agreed to pay him a certain sum, either in oil or cash, out of one-half of the first oil and gas produced, and while during the primary term such assignee entered into an agreement with the assignor that a new lease may be executed by the landowner directly to the assignee, and that the old lease may be canceled, and by which agreement the assignee is bound to deliver, in the pipe line to which wells drilled on the premises were connected, seven-sixteenths of the oil · produced until the assignor had received $40 per acre for the land covered by the lease, and by which agreement the assignor further releases the other consideration for the assignment, and where such new lease is executed by the landowner to the assignee, and later the assignee assigns such lease to a third person, such third person takes the leasehold interest subject to the assignor's property rights therein and occupies a position of trust and confidence to the assignor, so that such third person is bound not to deal with the premises to his own advantage in derogation of the property rights of the assignor.

This proposition is an abstraction and has no bearing upon the real issues before us. It may be admitted that it is correct as an abstract proposition of law, but it completely ignores the controlling facts in this case, which are that the assignees of Montgomery under the final contract of January 26, 1926, were by express stipulation relieved of the duty of developing any of the land and also had the right to surrender the lease. Said contract, in consideration of the $4,000 cash paid to Montgomery at the time of its execution, released Ramsey et al. and their successors from any and all personal and individual liability theretofore existing, and "from all claims, demands and causes of action which may have accrued or which may hereafter accrue to him" (Montgomery) "against said parties, based upon or arising

out of the terms, provisions and conditions of said assignments and each of them and does hereby release any right, title or interest which he may have under the original oil and gas lease of E. B. Johnson and others to George E. Montgomery." By the express terms of that contract, he agreed to accept the sum of $40 per acre out of oil or gas produced from the leased premises, "if, as and when produced." If the contract had stopped there, it is possible that an implied obligation to use reasonable effort' to explore and develop the leases would have given Montgomery an interest which the courts could recognize, but, as shown in the contract hereinbefore set out, the implied obligation to develop is abrogated by this language: "It being expressly understood and agreed that this contract and ·agreement does not bind or obligate by implication or express understanding the first parties or their assigns or successors to develop said premises or any of them for oil or gas."

██ In the plainest possible language, Ramsey and his assigns and sublessees are relieved of any duty to develop any of the leased premises and are given the option of surrendering the leases at any time prior to the expiration of the primary term. They could, therefore, fail and refuse to explore and develop the land or could surrender the leases without incurring any liability whatever to Montgomery. The contract expressly predicates his right to receive $40 per acre ·upon the contingency that oil or gas or either of them may be thereafter produced from the premises and marketed. This contract was made for the purpose of settling the differences which existed between the landowners, Montgomery, Ramsey, and his associates, and in compromise and settlement of the lawsuit then pending in which Montgomery was asserting, in effect, the very rights again asserted in this case. By the execution of this contract, as expressly recited therein, all rights or supposed rights of the parties existing or supposed to exist by reason of the contract of May 29, 1919, were settled and ended, together with the lawsuit in which those rights were asserted. The right of Ramsey and his associates and sublessees, including the Phillips Petroleum Company, to fail or refuse to develop the premises, was expressly granted by Montgomery, and the agreement of the Phillips Petroleum Company made with the Johnsons several months before the expiration of the new leases, to afterward acquire the leasehold interests from the Johnsons, was, in its final analysis and legal effect, simply a surrender of the existing leases which they had the right to do under the express provisions above quoted.

In addition to the stipulations above quoted which relieved Ramsey and his associates of the implied obligation to develop, Montgomery agreed, in order to clarify and emphasize that point, as follows: "But it is understood that the liability of the said W. R. Ramsey or first parties shall not increase or create any obligation whatever to develop or operate the tracts of either of them covered by the several leases for oil or gas or to dispose of either of such products nor shall any such obligation be implied for the purpose of realizing to the said George E. Montgomery said sum of money or any part thereof and no liability shall result from the failure of the said W. R. Ramsey or the other first parties to develop or operate said tracts or any of them or the lands mentioned in the several nine leases," etc.

It is difficult to conceive of how a more complete or absolute acquittance and release of any obligation resting upon Ramsey or his sublessees could be made or expressed than is shown by the language quoted. Such being the case, Montgomery's sublessees were simply exercising their legal right in failing to develop.

It is said in 1 C. J. 965, § 58: "No cause of action arises from the doing of a lawful act or the exercise of a legal right if done or exercised in a lawful and proper manner, the resulting damage, if any, being damnum absque injuria." To this doctrine we find the following annotation: "The exercise by one man of a legal right cannot be a legal wrong to another. * * * To state the point in a few words, whatever one has a right to do, another cannot have a right to complain of. * * * The exercise of a right conferred by a valid contract in the manner provided by its terms cannot be the ground of an action. * * * It is a principle well established that when a· person, corporation or individual is doing a lawful thing in a lawful way, his conduct is not actionable, though it may result in damage to another; for, though the damage done is undoubted, no legal right of another is invaded, and hence it is said to be damnum absque injuria."

The allegation of the plaintiff is that the Phillips Petroleum Company was guilty of fraud in agreeing with the Johnsons, prior to the expiration of the nine leases, to acquire the land under a new lease direct from the Johnsons after the nine leases had terminated. We are not called upon to discuss the ethical questions involved in this case. Neither Ramsey, Phillips, nor any other lessee of any of the Johnson Ranch were bound to develop any of the premises, and, even though their purpose in failing to develop was to permit the nine new leases to expire and to acquire the premises from the Johnsons by new leases, it does not constitute such fraud as the courts will recognize, because they were acting within their legal rights in doing so.

As said in 12 R. C. L. 237, § 8: "There is no fraud where there is nothing wrong and fraud cannot be deduced or inferred from that which the law pronounces honest. Nor can it be predicated upon acts which the party charged has a right by law to do, provided he pursues such right by lawful means, nor upon the nonperformance of acts which by law he is not bound to do, whatever may be his motive, design or purpose, either in doing or not doing the acts complained of."

Montgomery and Phillips both knew when the nine leases would expire. They both had the privilege and the right to again lease the land from the Johnsons. The ground of Montgomery's complaint is that Phillips did obtain a new lease while he slept upon his right. The books contain many cases which illustrate the principle that a party cannot be held in damages or charged with fraud when the sum of his offending is in doing or failing to do what under a contract or plain rule of law he may do or refuse to do. The principle is clearly illustrated by the case of Franklin Insurance Co. v. Humphrey, 65 Ind. 549, 32 Am. Rep. 78. It appears from that case that Humphrey owned a wharfboat which he insured for the benefit of his mortgagees, that the boat was anchored in the Ohio River at Evansville, that a large sheet of floating ice broke the boat from its mooring and it was carried away and wholly destroyed. He sued the insurance company, which set up, among other defenses, that Humphrey knew the boat was old and practically worthless; that it was his duty to remove it to a place of safety during the season when floating ice became a hazard to such boats; that Green river, which empties into the Ohio eight miles above Evansville, was such a place of safety, and that Humphrey was guilty of fraud in permitting the boat to remain at Evansville and in failing to tow it to Green river and moor it there. With reference to this defense, the Court said: "The appellant discusses the question of fraud set up in the second paragraph of answer, and insists, that, although the facts offered to be proved might not amount to any thing more than negligence which would not prevent Humphrey from recovering on the policy, yet, when a fraudulent purpose and corrupt design entered into his conduct by which he desired that the boat should be lost, 'in order that the insurance money might be recovered,' they amount to fraud which will prevent him from recovering on the policy; but if Humphrey, as we have held, had a right to keep his boat at the wharf in the city of Evansville, his motive, intention or purpose in doing so could not vitiate his acts. Fraud can not be predicated upon acts which the party charged has a right by law to do, nor upon the nonperformance of acts which by law he is not bound to do, whatever may be his motive, design or pur-

pose, either in doing or not doing the acts complained of."

In Southwestern Oil & Refining Co. v. Morgan (Tex. Civ. App.) 280 S. W. 319, 322, the lessor in an oil lease declared a forfeiture because the lessee permitted a laborer's lien to be filed against the premises. The lessee filed suit, and Judge Dunklin, upon that point, said: "If the defendant had the legal right to declare a forfeiture of plaintiff's contract by reason of the filing of the laborer's lien, no damages would be recoverable for the exercise of that right, even though it should be said that the assertion thereof was for the purpose of disposing of defendant's interest upon more advantageous terms than those embodied in its contract with the plaintiff"—citing Knowles v. Gary & Burns Co. (Tex. Civ. App.) 141 S. W. 189; Pye v. Cardwell, 110 Tex. 572, 222 S. W. 153; 26 R. C. L. 757; 12 R. C. L. 237.

In Tidal Western Oil Corporation v. Shackelford (Tex. Civ. App.) 297 S. W. 279, Judge Connor held that, where the owner of an interest in an oil and gas lease joined with the other owners in an assignment to defendant, and later assigned his interest in the lease to plaintiff, who negotiated with third persons for the sale of his interest, the defendant's action in advising such third person of its claim was not an unlawful interference with the contract and was no ground for damages in plaintiff's favor for the refusal of such third person to continue taking oil, since the act of interference to be actionable must have been knowingly done without right or justifiable cause; citing, amongst other authorities, the case of Hardin v. Majors (Tex. Civ. App.) 246 S. W. 100, by this Court.

Appellant does not charge that there was a conspiracy between Phillips Petroleum Company and any other party to defraud him. In fact, during the argument, appellant's counsel stated that the Johnsons were made parties merely pro forma, and no right of action was asserted against them. In so far as fraud is concerned, the whole complaint is that Phillips, in failing to develop and in contracting for new leases with the Johnsons before the expiration of the existing leases, was prompted by fraudulent motive.

In 1 R. C. L. 319, § 6, it is said: "Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right. It has been said that malicious motives make a bad case worse, but they cannot make that wrong which in its own essence is lawful." See Breckenridge Ice, etc., Co. v. Johnson (Tex. Civ. App.) 262 S. W. 1071.

Montgomery had expressly authorized all

sublessees to hold the premises until the expiration of the term without development, and had received $4,000 in cash as part of the consideration for the agreement. Having authorized them so to do, and to surrender the lease at any time, he cannot question their motives in not drilling nor charge them with fraud in contracting for new leases before the expiration of the leases in which he was interested, and the Phillips Petroleum Company's motive cannot be questioned by him. Barker Painting Co. v. Brotherhood, etc., 57 App. D. C. 322. 23 F.(2d) 743; Hartz v. Stauffer et al., 163 La. 382, 111 So. 794; Overhultz v. Row, 152 La. 9, 92 So. 716; Louisville & N. R. Co. v. Jackson, 139 Ga. 543, 77 S. E. 796.

■ Under their contract, no fiduciary relation existed between Montgomery and Phillips as the assignee of Ramsey. The petition shows that it was a business deal in which each party was looking after his own interest in the settlement of their property rights and of a pending lawsuit. Their relations, duties and obligations were definitely fixed by the contract. A fiduciary debt is one founded upon or arising from some confidence or trust, as distinguished from a debt founded simply on contract. 25 C. J. 1118, § 5.

If oil had been produced, the relation of debtor and creditor would have existed, but there was at most only a faint hope that such relation would ever arise. They agreed that "no liability shall result from the failure of Ramsey and the other first parties to develop." Montgomery has no standing in any court until successful development. If no lessee ever obtained oil or gas, then, according to the petition, no one owed Montgomery $40 per acre for the leased premises. There was no debt due from any one until after exploration and development had resulted in securing either oil or gas. In its general sense, the word debt means that which one person is bound to pay to another (Barber v. City of East Dallas, 83 Tex. 147, 18 S. W. 438), and necessarily implies the existence of a debtor. If Montgomery's asserted claim is a debt, then who is the debtor? The asserted right was, therefore, a mere contingency, or, in other words, "there is no liability until the happening of the event, the occurrence of which creates the liability." 13 C. J. 117. "A contingent liability is one thing, a contingency the happening of which may bring into existence a liability is another, and a very different thing. In the former case there is a liability which will become absolute upon the happening of a certain event. In the latter there is none until the event happens. The difference is simply that which exists between a conditional debt or liability and none at all. Fernald v. Johnson, 71 Me. 437, 440." 13 C. J. 117, note [c].

We are asked to declare the existence of a trust in Montgomery's favor and to enforce some kind of an equitable lien in his behalf. The question arises upon what property as the subject-matter can we declare a trust or enforce a lien? When the primary term of the leases expired without production, the mineral estate reverted to the Johnsons, who were the fee owners, and the interests claimed by Montgomery, Ramsey, and all their lessees immediately ended.

As said in Bogert on Trusts, 251: "Every trust must have some property as its subject-matter. This property may be of any kind recognized as valuable by a court of equity. The subject-matter of the trust must be certain in order that the trust be enforceable. A trust without subject-matter is inconceivable. It could not exist any more than a trust without a trustee or a beneficiary. Some property must be fixed as the res to be held by the trustee for the beneficiary."

What we have said disposes in full of appellant's contentions. Believing that the court did not err in sustaining the general demurrer to the petition, the judgment is affirmed.