

**NUMBER 13-06-490-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

GEORGE T. MOENCH,                                                        **Appellant,**

**v.**

DENNIS AND PATTI NOTZON,                                          **Appellees.**

---

**On appeal from the County Court at Law No. 1
of Cameron County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Benavides
Memorandum Opinion by Justice Benavides**

The two happiest days in a boat owner's life are the day he buys the boat and the day he sells the boat, or so the saying goes. In this case, both days are involved, and neither the buyer nor the seller is happy. Appellees, Dennis and Patti Notzon, brought suit against appellant George Moench for his failure to return a "deposit" they paid in the course of attempting to purchase Moench's boat. After a jury trial, the trial court rendered

judgment awarding actual damages, mental anguish damages, exemplary damages, and attorney's fees apparently under the Texas Deceptive Trade Practices Act ("DTPA"). *See* TEX. BUS. & COMM. CODE ANN. § 17.50 (Vernon Supp. 2007). Moench argues that the evidence is legally and factually insufficient to support the jury's findings and that the trial court should have granted a mistrial. For the reasons that follow, we affirm.

## I. BACKGROUND

Dennis Notzon is an Arizona resident. He is married to Patti Notzon. Dennis was employed as a truck driver and a heavy machine operator for some time, but he was forced to retire when he injured his back. The Notzons then survived on Dennis's disability pay, Patti's disability pay, and social security income the Notzons received for their minor child. This apparently was not enough to sustain their family, as the Notzons filed for and finalized their bankruptcy in 2002.

Not wanting to "just sit around," Dennis began exploring a career in scuba-diving. Dennis began looking for a boat to purchase in the hope of later finding underwater employment. He located a listing on the internet for a 58 foot sailboat called the "Fat Duck." Dennis was interested in the boat because it had a flat deck that was suitable for diving.

The listing referenced Mark Stuart as the boat's contact person. Dennis contacted Stuart on multiple occasions over the course of a few months to discuss the boat. Stuart represented that he was the boat's salesman, but George Moench actually owned the boat. Before Dennis traveled to Texas to view the boat, Stuart represented that the boat was "a good boat." Stuart told Dennis that the Fat Duck "was really dirty and needed cleaning from one end to the other" and needed fresh paint; otherwise, it was overall sound.

2

In November 2003, the Notzons traveled to Port Isabel, Texas, to look at the boat. They met with Stuart at Anchor Marina where the boat was docked. After viewing the boat, the Notzons and Stuart drove the boat out to sea for 15 to 20 minutes. The Notzons then met with Stuart and Moench on November 14, 2003, to negotiate the Notzons' purchase of the boat. Also present was Bill Coleman, the boat's "broker," and Stuart's secretary.

The parties' negotiations culminated in a "talking paper" setting out the terms the parties negotiated. Dennis testified that he requested the sale be contingent on a survey of the boat's structural condition. He recalled telling Moench and Stuart that he did not want to buy a boat that required much work. Anything more than a little sanding and painting would be too much for Dennis, given his disability. Moench initially refused to make the sale contingent on a favorable survey, but ultimately, Stuart convinced Moench that most boat sales include such provisions. Accordingly, the condition was included in the talking paper.

The Notzons presented Moench with a financial statement that showed that they had some equity in their home and that they had previously filed for bankruptcy. Moench testified that he reviewed the Notzons' financial statement and was aware of their financial condition. The Notzons needed owner financing because they could not get a loan with their credit history. They planned to sell their home to pay for the boat. Stuart represented to the Notzons that the boat's price was $115,000, which included a $15,000 deposit or down payment, and Moench agreed to finance the sale for the Notzons.

Dennis paid the $15,000 deposit that day. He testified that he believed that the $15,000 was paid to "hold the boat until the time [he] came down to get the survey to establish the [boat's] condition." Dennis testified that he asked what Moench would do with

3

the $15,000:

> Q.  Okay.  What was told to you when you paid the 15,000?  What was told to you about it?

> A.  I asked if that was going into an escrow account, like with a house, and I was told that I could wait until Monday and we could do an escrow account, or that it would just go into the safe until the time the sale was completed.

> Q.  Okay.

> A.  And I couldn't stay until Monday, which they knew . . . .

. . .

> Q.  Okay.  What did Mr. Coleman tell you?

> A.  About?

> Q.  About the money.

> A.  That it would go in the safe until the sale was finalized.

. . .

> Q.  Okay.  And then what did [Stuart] tell you about the money?

> A.  Just that it would be in the safe until the sale was finalized.

The talking paper was very short and did not include a lot of detail.  Regarding the survey and initial payments, it stated:

Sales Price $115k

Owner financed sale

Sale contingent on survey of structural integrity and haul-out
    Both parties agree to surveyor
    Boat must be insured by buyer prior to haul-out
    Buyer assumes responsibility of vessel upon acceptance of this agreement

Down Payment 15k
    Buyer can occupy and improve boat

4

> Boat cannot leave dock until the first balloon is paid
> Buyer assumes slip rent ($250 until occupied)

First Baloon [sic] $20k
> Due on sale of buyer's residence—NLT 120 days
> Boat must be insured
> Boat can only sail in US Gulf Coastal region

After the parties signed the talking paper and the Notzons paid the deposit, the Notzons returned home to Arizona. Dennis began searching for a surveyor to conduct the survey of the boat. Stuart recommended Manning Dierlam as the surveyor. Dennis hired Dierlam in February 2004 and paid him $350 to conduct the survey.

Dierlam told Dennis it would take three to five days to produce a written report after he conducted the survey. Dennis did not hear from Dierlam for 10 to 12 days after hiring him, so Dennis called. Over the phone, Dierlam reported that he had not been given access to the boat. Dierlam also stated that before he would be given access to the boat, the boat owner required that Dierlam send him any survey reports first before sending the report to Dennis. Dennis thought this was odd because he was paying for the survey, not Moench. It appeared to Dennis that Dierlam was taking orders from Moench, Stuart, and Coleman. Dennis testified that Dierlam finally obtained access to the boat on March 18-20, 2004.

Dennis's conversations with Dierlam, along with other factors, caused him to question the structural integrity of the boat. During Dierlam's survey, he drilled holes in and around the hatchway and below the hatchway on the inside of the boat. These holes indicated that the wood was saturated with water. Specifically, Dierlam reported that out of ten holes drilled, six to eight revealed wet wood one-half inch to one inch deep. Dennis testified that there was an air conditioner unit on the top of the deck that was leaking down

5

into the boat, causing water damage. Additionally, the railing on the front part of the boat was bending.

Further, in January, Stuart reported to Dennis that a hatch had blown off the top of the boat while it was sitting in the dock. Dennis testified that the hatches on the top of the boat have steel hinges with screws spaced an inch apart. Dennis stated that hatches do not usually blow off while the boat is docked—he took this as an indication that the boat's structure was damaged. Additionally, a satellite dish on the front part of the boat had blown off while the boat was docked. Dennis was concerned that the whole left side of the boat was damaged.

Dennis spoke with Dierlam on the phone on multiple occasions but had trouble getting Dierlam to submit a report in writing. After Dennis finally received Dierlam's written reports, Dennis noticed that the reports minimized the damage that Dierlam had previously reported over the phone.

The first report was dated March 29, 2004. It notes that "[t]he entry hatch into the port ama (or outrigger hull) has been wetted over an extended period of time allowing wood rot to occur into the area below the hatch and will require some repair to return the vessel to proper condition." Dierlam estimated that repairs for this damage would cost $750, although he estimated the total repairs needed to the boat to be $16,850. In contrast, at the bottom of the report, Dierlam states "[t]here is no apparent structural damage to the vessel as seen afloat."

On April 8, 2004, Dierlam drafted a second report. This report stated that "[a] small wood box approximately 2' below the hatchway was observed to be dry but slightly rotten from apparent freshwater wetted over a time period dripping down." It concluded, however,

6

that the boat was structurally sound. Curiously, the last sentence of the report reads, "This survey is submitted without prejudice as to any party." On April 8, 2004, Dierlam also issued a third report. This report was essentially identical to the first report, except that the estimated cost of total repairs was reduced to $8,600.[1]

After finally receiving Dierlam's reports and Stuart's report that parts of the boat were blowing off while it was docked, Dennis requested that Moench return his $15,000 payment. Dennis initially spoke to Stuart about getting his money back. Stuart told Dennis that he would pass along the information to Moench. After Dennis received no response, he began writing letters to Moench.

In a letter dated April 5, 2004, Dennis requested that Moench return his money. Dennis referenced his concerns about the boat's wet wood and Dierlam's report. He wrote:

> We finally have word on the survey we requested (which the owner still has not approved) and it reveals 'wet wood' more than one half the thickness of the wood, with water running out of the bulkhead below the hatch on the port ama. Manning reports that out of ten holes drilled, six to eight reveal 'wet wood' one half inch to one inch deep. This is considered structural damage, and releases us from our agreement to purchase Fat Duck on our talking paper.

Dennis received no response to this letter.

Dennis wrote again on April 11, 2004. He attached a portion of Dierlam's survey to the letter. He again referred to the wet wood Dierlam discovered. He asked for a full refund of his $15,000 payment. Dennis noted that this was his second written request for a refund and further wrote, "We would like to keep this amicable." Again, Moench did not respond or return the Notzon's money.

Dennis wrote his third letter on April 15, 2004. In this letter, he again noted that he

---

[1] On May 13, 2004, Dierlam issued a fourth report that is essentially identical to the second report.

7

had requested a refund several times without any response. He threatened legal action but stated that he would like to avoid litigation if possible.

Moench finally responded with a letter asserting that the Notzons were in default under the contract and that ownership of the boat had reverted back to him. Specifically, Moench asserted that the Notzons had failed to pay the balloon payment of $20,000, which he asserted was due on March 14, 2004, and thereafter failed to make the first of the 96 monthly payments under the agreement. Moench claimed that there was no evidence of any structural damage. He noted that he had not received the entire survey conducted by Dierlam. Moench asserted that the wet wood discovered by the survey was merely a cosmetic flaw and not a structural integrity problem.

On June 1, 2004, Moench sent an e-mail to Dennis. It stated:

> To start with you are incorrect in your assumption that structural damage was found—you have never furnished the full survey and have promoted one fabrication after another and the truth of the matter is you have past deadline after deadline with the only thing to support your case is half truths and distortions. For once in your life be a man and quit telling half truths—when you let us see all of the survey and have it confirmed by the surveyor and the statement no structural damage is present is not there I will be more convinced you are honest.

The Notzons filed suit against Moench, Stuart, and Coleman seeking a return of their $15,000 payment, alleging negligence, breach of contract, conversion, money had and received, unjust enrichment, fraud, negligent misrepresentation, and violations of the DTPA. Moench answered and counterclaimed for breach of contract.

The case was tried to a jury, which found that Moench breached his contract with the Notzons and that the Notzons had not breached the contract. The jury also found for the Notzons and against Moench on their claims for unjust enrichment, money had and

8

received, fraud, negligent misrepresentation, DTPA "laundry list" violations,[2] and unconscionable conduct. It found that Moench's conduct was knowing and intentional. It awarded $18,000 for "lost monies;" $2,500 in incidental damages; $20,000 for mental anguish; attorney's fees of $16,242.50 for trial of the case and an additional $10,000 for a successful appeal; and $5,000 in exemplary damages. The jury did not find Stuart or Coleman liable on any question submitted. The trial court rendered judgment awarding the Notzons all the damages found by the jury plus pre-judgment interest and post-judgment interest.

## II. UNCONSCIONABLE COURSE OF ACTION

In his first issue, Moench asserts generally that the evidence is insufficient to support the jury's verdict. He attacks every theory of recovery found by the jury. When a plaintiff receives favorable findings on two or more theories of recovery, the plaintiff is entitled to judgment on the theory which affords the greatest recovery. *Boyce Ironworks, Inc. v. S.W. Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988). In this case, the trial court awarded actual damages, mental anguish damages, exemplary damages, and attorney's fees, thus indicating that the Notzons' recovery was for DTPA violations.[3] Accordingly, we will first address Moench's issues challenging the Notzons' recovery under the DTPA. TEX. BUS. & COMM. CODE ANN. §§ 17.41-.63 (Vernon 2002 & Supp. 2007); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 613 (Tex. App.–Fort Worth 2006, pet. denied) (reviewing DTPA findings first because they afforded greatest recovery).

---

[2]TEX. BUS. & COMM. CODE ANN. § 17.46 (Vernon Supp. 2007).

[3] Mental anguish and exemplary damages are not available for unjust enrichment, money had and received, or breach of contract claims. *See Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 613 (Tex. App.–Fort Worth 2006, pet. denied) (no mental anguish damages for breach of contract). Additionally, attorney's fees are not available for a common-law fraud claim. *Id.* at 613.

Moench asserts that the evidence is legally and factually insufficient to support a finding that he engaged in unconscionable conduct. *See* TEX. BUS. & COMM. CODE ANN. § 17.50(a)(3) ("A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: . . . any unconscionable action or course of action by any person . . . ."). Moench's sole argument is that because he was entitled to keep the $15,000 "deposit" pursuant to the terms of the contract, the evidence conclusively establishes that he did not engage in unconscionable conduct. He argues that the Notzons were required to have a survey conducted within 120 days after the talking paper was signed, or March 14, 2004. Because the Notzons did not comply with this condition and did not make further payments under the talking paper, he claims he was entitled to keep the $15,000. He cites *Texas Beef & Cattle Co. v. Green* for the proposition that "[w]hatever a man has a legal right to do, he may do with impunity . . . ." 921 S.W.2d 203, 211 (Tex. 1996).[4] Moench's argument misses the mark.

The language quoted above from *Texas Beef & Cattle Co.* was contained in the court's discussion of a legal justification defense to a claim for tortious interference with a contract. *Tex. Beef & Cattle Co.*, 921 S.W.2d at 211. In that case, the plaintiff sued for interference with a contract, and the jury found that the defendant was legally justified to interfere with the contract because the defendant was acting within his legal rights. *Id.* at 210. However, the trial court disregarded the jury's justification finding because it found that the defendant acted with ill will, spite, and actual malice. *Id.* The Texas Supreme Court rejected this formulation of the justification defense to a tortious interference claim:

---

[4] We note that this is the *only* case cited by Moench as a justification for his actions. While it is tempting to dismiss Moench's issue as inadequately briefed, TEX. R. APP. P. 38.1(h), we prefer to address the merits.

10

> As we noted in *Sakowitz, Inc. v. Steck,* the justification defense is based on either the exercise of (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken. *Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex.1984), *overruled on other grounds by Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). Thus, if the trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, then the defendant has conclusively established the justification defense, and the motivation behind assertion of that right is irrelevant. Improper motives cannot transform lawful actions into actionable torts. "'Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right.'" *Montgomery v. Phillips Petroleum Co.,* 49 S.W.2d 967, 972 (Tex. Civ. App.-Amarillo 1932, writ ref'd).

*Tex. Beef & Cattle Co.*, 921 S.W.2d at 211.

In contrast, with respect to a DTPA claim based on unconscionable conduct, Texas courts have consistently held that the transaction at issue must be viewed as a whole. *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex. 1985); *Cooper v. Lyon Fin. Servs., Inc.*, 65 S.W.3d 197, 207 (Tex. App.–Houston [14th Dist.] 2001, no pet.). As a general proposition, Texas courts have not adopted a "legal justification" defense to a DTPA action based on unconscionable conduct, as has been done with a tortious interference with a contract claim. It may be that in some cases, a defendant's conduct is not unconscionable where the evidence shows that the defendant merely acted pursuant to its rights under a contract with the plaintiff and nothing more. *See, e.g.*, *Scitern v. Birdsong Corp.*, No. 11-99-0236-CV, 2000 WL 34235177, at *4 (Tex. App.–Eastland 2000, no pet.) (not designated for publication) (finding no evidence that defendant acted unconscionably where only evidence demonstrated that defendant offset plaintiff's debt pursuant to terms of a promissory note). Additionally, evidence of unconscionable conduct must amount to more than a "mere breach of contract" to support DTPA liability. *Mays v. Pierce*, 203 S.W.3d 564, 572 (Tex. App.–Houston [14th Dist.] 2006, pet. denied). However, it is also true that

acts may be unconscionable even though performed pursuant to a contract, particularly when the record contains additional evidence of representations regarding the contract's interpretation or other acts that support the finding of unconscionability. *See Weiler v. United Sav. Ass'n of Tex., FSB*, 887 S.W.2d 155, 159-60 (Tex. App.–Texarkana 1994, writ denied).

For example, in *Weiler,* the plaintiffs alleged that the defendant bank engaged in unconscionable conduct by foreclosing on their home after improperly deducting amounts from an escrow account intended to pay taxes on the home. *Id.* at 157. Specifically, the plaintiffs argued that the bank withdrew money from the escrow account to pay the bank's attorney's fees after a bankruptcy court altered the payments due by the plaintiffs to the bank on their mortgage. *Id.* Then, due to the deficiency in the escrow account caused by the improper withdrawal, the bank sent conflicting demands for additional amounts it believed were due under the note and under the bank's construction of the bankruptcy court's order. *Id.* The trial court granted summary judgment to the bank on the DTPA claim, but the court of appeals reversed. *Id.*

The court of appeals held that although a proper foreclosure in compliance with the law will not support a DTPA cause of action, the plaintiff's evidence that the bank improperly withdrew money from the escrow account to pay its attorney's fees and then sent conflicting demands for payments constituted some evidence that the bank "tried to take advantage of the Wielers' lack of knowledge, ability, and experience to a grossly unfair degree." *Id.* at 160. This holding came in the face of the bank's arguments that their conduct was justified by the plaintiff's mortgage and by the bankruptcy court's order. *Id.* Thus, even though a party believes that it is acting pursuant to a contract, its conduct may

still constitute an unconscionable course of action. *See id.*; *see also Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 538 (Tex. App.–Corpus Christi 1989, writ denied) (holding escrow company engaged in unconscionable conduct by incorrectly identifying party entitled to escrow funds in its documentation, erroneously releasing escrow funds to unauthorized party, and later representing that it still retained the funds pursuant to escrow agreement); *Sun Power, Inc. v. Adams*, 751 S.W.2d 689, 695 (Tex. App.–Fort Worth 1988, no writ) (holding that owner of office machines company engaged in unconscionable course of conduct by refusing to refund customer's money or accept return of broken cash register).

We believe that, viewing the transaction as a whole, the evidence in this case supports a finding of unconscionable conduct, despite Moench's claim that he was merely acting pursuant to the talking paper. The evidence demonstrates that Dennis paid $15,000 to hold the boat until the sale was completed and that the entire sale was conditioned on a survey that demonstrated the boat was structurally sound. Moench, through his agents, represented that the $15,000 would be kept in a safe and returned if the sale was not completed. Dennis also testified that he told Moench, Stuart, and Coleman that, due to his disability, he could not perform structural repairs on the boat beyond simple sanding and painting. Despite having this information, Moench claimed that water damage, which would require substantial work to remedy, did not constitute a sufficient reason to withdraw from purchasing the boat.

Although Moench contends that Dennis only had 120 days to have the survey performed, the talking paper does not impose any such condition. Rather, the 120 day limitation appears to apply only to the Notzons' first payment, which was to be made after

13

the Notzons' home was sold. Nevertheless, even assuming that the 120 day deadline applied to obtaining a survey, Dennis testified that the surveyor that Stuart recommended, Dierlam, was being influenced by Moench.

Dennis testified that he hired Dierlam in February and that Dierlam promised a report within a short time after gaining access to the boat. But Dierlam was not given access to the boat initially and was made to promise that any survey would be given to Moench before being presented to the Notzons. According to the reports, Dierlam did not conduct his survey until after March 14, 2004, which Moench contends was the deadline to complete the survey. Furthermore, Dennis testified that he received conflicting reports from Dierlam. Dierlam reported structural problems with the boat to Dennis over the phone, but his written reports were significantly toned down. From this evidence, the jury could have reasonably believed that Moench interfered with the survey so that the Notzons could not recover their $15,000 deposit.

Once Dennis began requesting his money back, he initially received no response. Once a response was received, it was hostile and demeaning. Moench was aware of the Notzons' financial position and their need for the deposit. Moench was also aware that the Notzons live in Arizona and would be required to travel to resolve the dispute. Under these circumstances, we believe the evidence was legally and factually sufficient to support the jury's finding that Moench took advantage of the Notzons' lack of knowledge, ability, experience, or capacity to a grossly unfair degree. *See Weiler*, 887 S.W.2d at 159-60; *Griffith v. Porter*, 817 S.W.2d 131, 136 (Tex. App.–Tyler 1991, no writ) (finding unconscionability where defendant retained overpayment for months despite repeated requests for refund). Accordingly, we overrule Moench's first issue.

14

## III. Mistrial

By his second issue, Moench argues that the trial court erred by not granting a mistrial. At one point during Stuart's testimony, Stuart engaged in a lengthy statement about the boat's seaworthiness. The Notzons' attorneys then asked if Stuart was under the influence of drugs and commented that Stuart's speech was slurred. Moench's attorney did not immediately object. After the Notzons' attorney finished questioning Stuart, Moench's attorney asked for a mistrial outside the jury's presence. He argued that Stuart's appearance was irregular and would cause harm to Moench and Coleman. Moench's attorney suggested that Stuart was intoxicated. The trial court denied the motion for mistrial.

Thereafter, Moench's attorney asked that the record reflect that Stuart had to be "revived from a state of unconsciousness while sitting at the table with defense[.] He was either asleep or under the influence of drugs and unconscious." The trial judge stated, "Well, I will agree that he was asleep and he had to be woken up. I don't know that it was to the degree of unconsciousness." The trial court then reiterated that the bailiff woke Stuart up in front of the jury. Moench's attorney also asked that the record reflect that the defendants were all seated at the same table in front of the jury. The trial court noted, however, that Stuart had his own attorney.

Moench argues that Stuart's connection to the case was as Moench's agent, and because Stuart was seated at the same table with Moench at trial, Stuart's conduct reflected on Moench. Thus, he argues, Stuart's trial demeanor was "outrageous and prejudicial" to Moench and "influenced the jury verdict" in this case.

15

The record demonstrates that when the Notzons' counsel asked Stuart if he was intoxicated, Moench's counsel did not immediately object, request an instruction, or move for a mistrial. *See* TEX. R. APP. P. 33.1(a) (requiring a *timely* complaint). Rather, he waited until a break in the evidence to raise the issue for the first time. Moench's counsel then asked the trial court to acknowledge on the record that at some point earlier in the trial, the court's bailiff was required to wake Stuart up. Moench's counsel did not object at that time either, but rather, he waited until later in the trial to raise the issue. Moench has not explained in his brief why he could not have timely raised the issue in the trial court or why an instruction regarding Stuart's conduct could not have cured any prejudice Moench perceived by being seated with Stuart at counsel's table. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (rejecting appellant's argument regarding improper comments by trial court because appellant failed to explain how comments were incurable or excuse his failure to preserve error). Accordingly, we hold that Moench waived his second issue.

## IV. CONCLUSION

Because we find that the evidence was legally and factually sufficient to support the jury's finding of unconscionable conduct and that Moench waived any error related to Stuart's conduct at trial, we affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Memorandum Opinion delivered and
filed this the 13th day of March, 2008.

16