**WHEELOCK et al. v. BATTE et al.**

No. 9822.

Court of Civil Appeals of Texas. Austin.

Nov. 16, 1949.

Rehearing Denied Dec. 7, 1949.

Second Rehearing Denied Jan. 4, 1950.

W. W. Mason, of Mexia, for appellants.

E. A. Camp, of Rockdale, Emory B. Camp, of Cameron, Charles C. Smith, Jr., of Cameron, for appellees.

HUGHES, Justice.

The lessors in an oil and gas lease sued the lessees, by assignment, for cancellation of such lease as a cloud on their title and for damages.

In a non-jury trial judgment was rendered as prayed for, the damages assessed being $23,262.50, with interest.

The lessors were appellees, R. L. Batte, Jr., and his sister, Mrs. Lelia Batte Hickman. They owned only the mineral rights under the land, the surface being owned by their father. Lessees, who are appellants, were Robert L. Wheelock, Jr., his wife, Robert Q. Kennaugh, his wife, Vernon H. Willis, his wife, and H. P. Wells, Jr.

R. L. Batte, Jr., acted for his sister in all matters pertaining to this controversy.

The oil and gas lease was dated March 13, 1947, and covered 930.5 acres of land out of the J. F. Frazier Survey in Milam County, Texas, and contained this provision: "If operations for drilling are not commenced on said land on or before one year from this date the lease shall then terminate as to both parties unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in Rockdale State Bank at Rockdale, Texas * * * the sum of Nine Hundred Thirty & 50/100 Dollars ($930.50), (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months."

Appellees sought cancellation of the lease on the grounds that "operations for drilling were not in good faith commenced on said land during said one year period," and that no rents were paid or tendered.

The wrongful acts on the part of appellants, on which the claim for damages was based, were alleged to be (1) failing and refusing to furnish a recordable release of the oil and gas lease; (2) trespassing on the leased lands after termination of the lease; and (3) asserted ownership of the lease by appellants which constituted slander of appellees' title.

Appellees also pleaded that the acts and conduct of appellants, particularly the refusal to deliver a recordable release, rendered appellees' title unmerchantable at a time when the reasonable market value of a similar oil and gas lease on the property was $25 per acre; they also specially plead the loss of a particular sale of an oil lease on this property for $25 per acre. The lease was valueless at the time of trial.

It is not contended that rents, to extend the lease, were paid or tendered.

Appellants assert that they timely commenced drilling operations in good faith and that diligent prosecution of these operations was excused by declarations, acts and conduct of appellees.

Preliminary to a detailed statement of the evidence we make this observation from a careful study of the entire record:

There was considerable oil activity in the vicinity of these lands on March 13, 1948, the first anniversary of the lease in suit. For this lease appellants had paid $5,000 to appellees in March 1947. Its value on March 13, 1948, was $25 per acre, or a total value of about $18,000 above its cost.

Appellees seemed very anxious for the lease to lapse, and this for obvious reasons. Appellants wanted very much to keep the lease alive, but for as little cost as possible. Their reasons are also obvious.

With these counter motives in mind, we will relate the facts.

The Railroad Commission advised appellant Wheelock on March 8, 1948, that his February 27, 1948, notice of intention to drill a wildcat well on these lands had been received.

On March 5, 1948, Mr. Wheelock, acting for all appellants, made a contract with the Daniel Oil Company, Inc., to drill a well on this lease, the well to be commenced on or before March 13, 1948; the consideration to Daniel being an assignment of 100 acres of the lease and $7,000 cash upon completion of the well.

On or about March 1, 1948, one of appellants telephoned the County Surveyor of Milam County and requested him to stake a location for the well on this lease. This location was not made by the surveyor until the morning of March 13, because the weather was bad and the surveyor was rather feeble. One of appellants attempted to make a location on the 12th of March without the surveyor, but was unable to find the property lines.

On the evening of March 12, 1948, contractor Daniel telephoned the Rockdale

Terracing Company at Rockdale in Milam County, and instructed them to move a bulldozer to the lease and begin digging a slush pit. On the 13th of March the bulldozer commenced work and partially completed a slush pit on the leased land. This pit was finished on the following day and also a reserve pit was dug. The bulldozer then broke down and after being repaired moved, on March 17, 1948, to other lands not connected with this lease.

No further work was attempted on the leased land until April 23, 1948, when contractor Daniel had a bulldozer move on the land and begin clearing a right of way. Within a few hours this work was stopped and the bulldozer moved off, upon notification by appellees to all concerned that they would be held liable as trespassers if they did not vacate the premises.

Appellee Mr. Batte testified that on the afternoon of March 13, 1948, he went to Rockdale and made inquiry at the Rockdale State Bank (lease rental depository) as to whether the rentals had been paid on this lease.

Mr. Batte also testified concerning two conversations which he had with Mr. Sam Daniel, drilling superintendent for contractor Daniel, on March 13, 1948, one in Milano and the other over the telephone. We quote:

"What did you say in Milano with reference to moving the bulldozer on there and going to work?" His reply was: "I did not say anything to him, but asked him if he wasn't one day late."

"Q. And you stated that he was starting a little late? A. Yes, that is how come he bring up his contract.

"Q. And you insisted at that time that he was late? A. No, I made the casual statement that he was late. I told him over the telephone and I asked him when I saw him in Milano.

*   *   *   *   *   *

"Q. When you told Sam that he was late, was that on the phone or when you saw him? A. It was on the phone and at the filling station at Milano.

"Q. But you told him on the phone and at the filling station? A. That I consid-

ered him late, and he said according to my contract it stated that they were to begin on or before the 14th.

"Q. And it is your contention that this lease expired at midnight of March 12, 1948? A. Yes, because it was made March 13, 1947, and when you take both 13th in you are taking in a year and a day instead of twelve months.

"Q. Is that the same contention you made to Sam? A. No, I did not tell Mr. Daniel that, I never made that statement in public until today on the witness stand."

Appellee Mr. Batte also testified:

"Q. If in the original petition this allegation is contained therein, state to the court whether or not it is correct: 'Plaintiff would show that operations for drilling were not commenced on said land during said one year period and the rentals called for in said lease were not paid to the bank for the account of lessors, and said lease ended and terminated at midnight, March 12, 1948?' A. Yes, sir.

"Q. And that is your contention? A. Yes, sir.

"Q. Then it is your contention that on the 13th of March 1948, when they went in there with the bulldozer to do so, the lease was already out? A. Yes, sir.

"Q. And it is your testimony now that you did not make that contention at that time to Sam Daniel? A. What contention?

"Q. That the lease was out? A. I would not say that I did not. Put it this way, I did tell Mr. Daniel I considered he was a little late, I told him that over the telephone and in person."

On March 29, 1948, appellees' attorneys sent appellants this notice:

"Enclosed find notice of forfeiture on 930½ acre tract out of the J. F. Frazier Survey in Milam County, Texas.

"You are advised that R. L. Batte, Jr., and Lelia Lee Batte are exercising the privileges granted in said lease of declaring forfeiture of same for non-payment of rentals and failure to commence operations for drilling before the lease expired.

"It will be appreciated if you will forward to us for delivery to these people a formal release."

The evidence shows that appellants have since March 13, 1948, claimed title to the Batte lease and as to these claims the trial court found, as a fact: "That the defendants' claims and assertions of title to said lease, and their failure and refusal to furnish a release of said lease upon request therefor, after said lease had terminated, were injurious acts intentionally done the plaintiffs without legal excuse."

Among others, the trial court made these conclusions of law:

"1. That what R. L. Batte, Jr., said to Daniel on March 13, 1948, in the town of Milano did not constitute notice to defendants of an assertion by said Batte of forfeiture or termination of said lease, and did not relieve the defendants of their duty under the terms of said lease to pay the delay rental provided therein on or before midnight of March 13, 1948, or in good faith to commence operations for the drilling of a well on said land on or before midnight of March 13, 1948, and to continue in good faith any operations for drilling commenced on or before midnight of March 13, 1948, after such date and time; so that, no such delay rental having been paid and no such operations for the drilling of a well having been commenced and continued in good faith, the lease had terminated ipso facto to April 23, 1948.

"2. That the defendants' re-entry upon said land on April 23, 1948, and their claims and assertions of ownership of said lease, and their failure and refusal to furnish said plaintiffs a release of said lease upon repeated requests therefor, after said lease had terminated, was a repudiation of the plaintiffs' rights in said land, and was a wrongful denial to plaintiffs of such rights, and constituted a wrongful ouster of plaintiffs from such lands, a trespass on their lands and estates, and an invasion of their legal rights and privileges.

"3. That said lease having terminated as aforesaid, the defendants had no further rights in and to said lands, and thereupon the defendants owed the said plaintiffs the legal duty to release said lease and clear the records of defendants' apparent title thereto; and that defendants' published assertions and claims of ownership of said lease, and their willful failure and refusal to furnish said plaintiffs a release of said lease upon their request and when defendants were apprised of plaintiffs' opportunity to lease said land, was a disparagement and slander of the plaintiffs' title thereto, and proximately frustrated a specific sale by plaintiffs of an oil and gas lease on said land to a willing and able buyer, to-wit: Carl O. Keels.

"4. That said lease having terminated as aforesaid, the defendants had no further rights thereunder, and thereupon the defendants owned the said plaintiffs the legal duty to release said lease and clear the records of defendants' apparent title thereto; and that defendants' willful failure and refusal to furnish such release and their persisting in such failure and refusal after they were apprised of plaintiffs' opportunity to lease said land prevented plaintiffs from leasing said land for $25 an acre, and was a wrong.

"5. That said unreleased and terminated lease, and defendants' acts and claims as aforesaid, constitute a cloud on plaintiffs' title to said lands, and that the same are subject to cancellation and removal in law and equity."

Appellees do not in this court contend that the lease expired on March 12, 1948. It is apparently conceded that appellants had until midnight March 13, 1948, to do the things required to keep the lease in force. At any rate, we so hold.

■ The above facts, in our opinion, reflect a studious effort on the part of appellees to forfeit appellants' lease. In fact they became so overzealous in this behalf that what we think was evidence of their intention to declare a forfeiture (formally declared 16 days later) was shown when appellants' driller was notified by Mr. Batte that he (Batte) considered "he was a little late" in commencing drilling operations. It is impossible to be a "little late" in a matter of this kind. Operations were either timely or late. If late, the lease was

subject to forfeiture. No doubt a lessor could be estopped to claim a forfeiture if he knowingly permitted drilling operations to begin late and kept silent. But here the lessors did not keep silent.

If we reverse the situation and suppose that drilling operations had in fact been commenced late and lessors had notified lessees of such fact, as in this case, but lessees went ahead with the work and later claimed the lease was valid, it would certainly be a very serious question as to whether they had not proceeded at their peril and without the right to receive any benefit from their drilling operations. Certainly it is not incumbent upon a lessor, under these circumstances, to use force or to resort to the courts to eject a trespassing lessee in order to protect a valid forfeiture. See Humble Oil and Refining Co. v. Kishi, Tex.Com.App., 276 S.W. 190.

■ Having advised the well driller by two communications on the last day for commencing drilling operations that he was too late, which information was relayed to appellants, it seems to us that equity and good conscience should require that this false and misleading information be retracted before forfeiture of the lease could be declared. The drilling contractor was also vitally interested in the validity of the lease since he was assigned 100 acres of it as part payment for drilling the well.

Mr. Batte at no time advised appellants that the drilling operations were timely commenced. In fact the record shows that he has persisted in his belief that the lease expired on midnight March 12, 1948. This is shown by (1) his oral statements on March 13, 1948, to Mr. Daniel; (2) first outright declaration of forfeiture 16 days later (letter of March 29, 1948); (3) a prior pleading in this suit; and (4) his testimony on the trial.

Surely Mr. Batte's consistent adherence to such belief was sincere and being so he should not complain that appellants, in the exercise of caution and prudence, ceased expensive drilling operations until the question raised by appellee could be authoritatively settled.

We believe this holding to be within the following principle stated in Morgan v. Houston Oil Co., Tex.Civ.App., San Antonio, 84 S.W.2d 312, 314: "Perhaps it should be added here that, long before the institution of this action to cancel, plaintiffs evidenced their intention to terminate the lease, afterwards gave defendants formal notice of such termination, and prosecuted that purpose by bringing this suit. It is well settled that when a lessor determines to forfeit or cancel an oil and gas lease, and puts the lessee on notice thereof, he cannot complain if the latter suspends operations under the contract, pending the determination of the asserted right of the lessor to forfeit or cancel. Lane v. Urbahn, Tex.Civ.App. writ ref., 265 S.W. 1063, par. 3; Edgar v. Bost, Tex.Civ.App., 14 S.W.2d 364; Johnson v. Montgomery, Tex.Civ.App. writ. ref., 31 S.W.2d 160."

The principal case was quoted with approval by the Galveston Court of Civil Appeals in Wisdom v. Minchen, Tex.Civ. App., 154 S.W.2d 330, writ ref. W.O.M., which in turn was cited with approval by the Supreme Court in Hoover v. General Crude Oil Co., 147 Tex. 89, 212 S.W.2d 140.

If we are in error in holding that the lease is still in effect, then we are of the opinion that the law and the evidence do not support recovery of damages in the sum awarded by the trial court.

Appellees advance three separate theories in support of the damages allowed: (1) trespass, (2) slander of title, and (3) failure to furnish release of oil and gas lease on demand.

*Trespass.*

■ The only act of trespass shown was the entry on April 23d when a bulldozer began to clear a right of way over the leased lands. The damage, if any, done by the bulldozer was done to the surface, which appellees did not own.

We do not construe the findings of the trial court to find that the land itself was damaged to the extent of $23,262.50; but, if so, such finding is without any evidence to support it.

Appellees rely upon the case of Humble Oil and Refining Co. v. Kishi, Tex.Com. App., 291 S.W. 538; Tex.Com.App., 276 S. W. 190; Tex.Civ.App., 261 S.W. 228, 230; Tex.Civ.App., 299 S.W. 687, as sustaining the judgment for damages. In that case the value of the mineral estate was destroyed by drilling a dry hole. The trespass here was of an entirely different character. It did not affect the value of the mineral estate in any way.

*Slander of Title.*

Malice is an essential element of a cause of action for slander of title, Jarrett v. Ross, 139 Tex. 560, 164 S.W.2d 550, and malice or "actual malice" in such an action has been defined as "ill will, bad or evil motive, or such gross indifference to or reckless disregard of the rights of others as will amount to a willful or wanton act." Winn v. Warner, Tex.Civ.App. Waco, 199 S.W.2d 560 at page 562, writ ref. N.R.E. Good faith, of course, will rebut malice. 27 Tex.Jur., p. 790.

The evidence, which we have set out rather fully above, is not, in our opinion, sufficient to support a finding of malice on the part of appellants. They paid appellees $5,000 for this lease in March 1947. Prior to March 13, 1948, appellants filed notice of intention to drill on the lease with the Railroad Commission. They made a contract with the Daniel Oil Company to drill the well and agreed to assign it 100 acres of the lease, which, according to the evidence, was on March 13, 1948, worth $2,500; further payment of $7,000 to Daniel was required upon completion of the well. Several days before March 13, 1948, appellants employed the County Surveyor to locate the well site and on the 13th actual operations to drill were commenced. Work on the lease continued on March 14th when the machinery broke down. No further work on the lease was done by contractor Daniel, according to Mr. Sam Daniel, solely because of the statements made by Mr. Batte that the work was commenced too late.

These facts do not reflect malice on the part of appellants. They tend to show just the opposite—good faith.

We note further, on the slander of title theory, that we are not directed to any testimony showing publication of any slanderous statements made by appellants concerning appellees' title, and that we, having gone over the record twice, are unable to find any such publication.

*Failure to Furnish Release.*

The lease involved did not provide that upon its termination lessees should furnish a recordable release.

It was shown that appellees made frequent demands upon appellants for a release, coupled with notice that they had "an excellent offer for a lease on this property."

We will first discuss the Texas authorities cited by appellees.

In Mickie v. McGehee, 27 Tex. 134, suit was on an arbitration bond, the alleged breach being that defendants failed and refused to execute a release of a deed of trust on certain slaves, and that such refusal was malicious and for the purpose of vexing and harassing the plaintiff. Judgment for the penalty of the bond was sought and a judgment of $200 was rendered by the trial court but reversed on appeal; the court saying: "In the present case, the plaintiff below had the possession and use of the mortgaged property, and is not shown to have been in any way damaged by the refusal of the defendants to execute a release of the mortgage. By reason of his prayer for general relief, he was entitled to a decree canceling the mortgage deed, or requiring the defendant to execute a release of the mortgage, and to his costs, and he was entitled to nothing more."

In Witherspoon v. Green, Tex.Civ.App. Dallas, 274 S.W. 170, 171, the court held unenforceable a promise to pay a lessee in an oil and gas lease $500 for a release of an admittedly expired lease, on the ground that the promise was without consideration, saying, "The law charged appellee with the duty of removing this cloud from appellant's title by the execution of a release of his apparent, though not actual, interest in the land."

In Knox v. Farmers' State Bank of Merkel, Tex.Civ.App.Eastland, 7 S.W.2d 918, 920, writ. ref., a mortgagor of land sued a mortgagee bank for damages for refusal to release the lien after the debt was paid. A general demurrer was sustained and on appeal the cause was reversed and remanded. The pleadings alleged that the refusal of the bank was because the mortgagor would not pay another debt, not connected with the lien debt, which he owed the bank, and that such refusal was wilful, malicious, illegal and without justification or excuse. The damages sought were $1,500, the sum for which an oil lease on the land could have been sold.

The court in that case construed the pleadings as alleging that the deed of trust expressly provided that the lien should be released upon payment of the debt, but, independently of this, the court held that "a legal duty rested upon the bank to release the lien upon the payment of the debt."

In our opinion the most that can be said of these cases is that where the obligation to give a release of a lien or encumbrance is not contractual, that the failure or refusal to execute and deliver such release must be malicious in order that unusual damages such as loss of a sale, be recoverable.

To avoid adding to this lengthy opinion we refer to the case of Hasquet v. Big West Oil Co., 9 Cir., 29 F.2d 78, also to 58 C.J.S., Mines and Minerals, §§ 205, 206, 207, 208, 209, pp. 519-524, and Vol. III Texas Law Review, p. 323, for a general discussion of this question. The Hasquet case is especially interesting because it contains a discussion of the Texas decision in Mickie v. McGehee, supra, by the Wyoming court in Barquin v. Hall Oil Co., 28 Wyo. 164, 201 P. 352, 202 P. 1107.

We gather from these authorities that at common law no right of action for damages arose for failure to release or discharge a lien or other claim against property. That as a result of this rule at least 34 of the states have passed laws requiring, under penalty, the release of record of liens and other encumbrances after satisfaction or discharge; but that even under such statutes one is not bound at his peril to determine disputed or doubtful questions concerning the validity of his lien or lease and that good faith in refusing to release may be shown as a defense to suits under such statutes.

■ We need go no further in this case than to hold that lack of good faith must be shown in a suit for damages for refusal to execute a recordable release of an oil and gas lease.

■ In our discussion of damages for slander of title we have held that the evidence was insufficient to support the finding of the trial court that appellants acted maliciously in asserting title to the lease and in refusing to give a release. The same insufficiency of evidence exists to show that appellants did not act in good faith in refusing to execute a release of the oil and gas lease.

Briefly, our reasons for holding that lack of good faith is essential to recovery in this character of suit are: A contrary rule would require that lessees determine, at their peril, their good faith claims to valuable properties, knowing that the penalty for being wrong could well be disastrous. In this case appellants either had to meekly surrender property of an admitted value of $23,000, or fight for their rights, realizing that if they lost they would be penalized in an unknown amount but which could be enormous, as shown by the trial court's judgment herein. Such a rule would tend to destroy one of the purposes for which our courts were created, i. e. to settle in an orderly and peaceable fashion controverises between our citizens.

It is well known that the oil and gas business is a fickle business, and those who engage in it should be aware of its volatile nature. If they are unwilling that disputes in this business be settled by the usual processes, then their activity in such field should be curtailed or they should, by contract, more clearly and definitely fix their rights and liabilities.

The judgment of the trial court is reversed and judgment is here rendered that appellees take nothing by their suit.

Reversed and rendered.

598

On Appellees' Motion for Rehearing.

PER CURIAM.

To the extent that this cause be reversed and remanded rather than reversed and judgment rendered for appellants, as previously ordered, appellees' motion for rehearing is granted; in all other respects it is overruled.

Granted in part; overruled in part.