

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

## No. 08-24-00010-CV

---

Thomas R. Craddick, Sr. and Sandra H. Staley, Appellants/Cross-Appellees

v.

Cimarex Energy Company, Prize Energy Resources, Inc. and
BPX Properties (N.A.) LP, Appellees/Cross-Appellants

---

On Appeal from the 143rd District Court
Reeves County, Texas
Trial Court No. 22-08-24486-CVR

---

## MEMORANDUM OPINION

Thomas R. Craddick, Sr., and Sandra H. Staley appeal from an adverse summary judgment rendered in their suit for bad-faith washout of overriding royalty interests, conspiracy, and breach of contract. In a cross-appeal, Cimarex Energy Company, Prize Energy Resources, Inc., and BPX Properties (N.A.) LP, appeal the trial court's denial of their motions for summary judgment on limitations, as an alternative ground for affirmance. We affirm.

## I. BACKGROUND

### A. The 1943 lease

In 1943, George C. Fraser, George L. Burr and David H. McAlpin executed an oil and gas lease (the Lease) to Standard Oil Company of Texas covering approximately 1,440 acres in Reeves County. The Lease required full development of the leased acreage, contemplating "the full prospecting and developing for oil and gas of the land hereby leased, including the putting down of as many wells as the facts justify[.]" Balanced against that clause, it also included a surrender provision:

> [I]n the event that Lessee or his assigns, by reason of failure to find oil in paying quantities, or for other reasons, desires the cancellation of this lease, or any part thereof, that they will in good faith have made out and delivered promptly to the Lessors . . . such release or cancellation paper as that, when placed upon the county records, will remove any cloud or lien upon [Lessor's] title to the land released in the event the recording of lease had placed any such cloud or lien upon same.

### B. The parties' interests under the Lease

The Lease was assigned several times in the following decades. In the course of those assignments, two overriding royalty interests (ORRIs) were reserved. In 1990, Thomas Craddick, Appellant/Cross-Appellee, acquired by assignment a portion of the Lease, limited as to a certain area and depth. He then reassigned that portion to NRM Operating Company, L.P., reserving an ORRI as compensation for services rendered. NRM reassigned the Lease to Staley Gas Co., Inc., which reassigned it to George Staley. In 2014, George Staley reassigned it to an affiliate of BPX, reserving a similar ORRI as compensation. [1] After Staley's passing, his ORRI passed to his wife, Sandra Staley, who is a Co-Appellant/Cross-Appellee in this proceeding.

---

[1] The lessee was actually BHP Billiton Petroleum Properties (N.A.), LP, a wholly owned subsidiary of Appellee/Cross-Appellant BPX. The parties refer to BHP and BPX collectively as "BPX." We follow suit.

Ownership of the underlying mineral interest[2] subject to the Lease followed a separate path, ultimately passing to Co-Appellee/Cross-Appellant, Cimarex Energy Co.[3]

As the chain of title demonstrates, at the time the Lease was assigned to BPX in 2016, Texas Pacific Land Trust owned the surface and a nonparticipating royalty interest (NPRI), while Cimarex owned the underlying mineral interest subject to the Lease, and Craddick and Staley owned ORRIs.

### C. The challenged transaction

At the time BPX acquired the Lease, it was in a tenuous state. Three wells had been drilled—one plugged and abandoned, one shut in, and one producing intermittently. Internally, BPX debated whether the Lease had already terminated for lack of production in paying quantities. BPX proposed and requested from Cimarex that it participate in workover operations, but Cimarex declined.

On March 2, 2017, BPX received an unsolicited offer from Cimarex for an acreage swap.[4] The proposal would require BPX to convey an 87.5% net revenue interest[5] (NRI) in acreage under the Lease and an interest in unrelated acreage. BPX, however, only owned a 75.9375% NRI in the

---

[2] Because the mineral estate had already been conveyed to Standard Oil and its assigns by the Lease, the underlying mineral interest included only a "possibility of reverter in the mineral estate" and a lessor's royalty. *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991). A possibility of reverter is simply "the real property term of art for what the grantor owns as a future interest." *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991). The Lease "actually convey[ed] the mineral estate (less those portions expressly reserved, such as royalty) as a determinable fee." *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). That is, Standard Oil and its assigns held "title to all of the oil and gas in place" in fee simple determinable. *Id.* at 192.

[3] The grantee was Appellee Prize Energy Resources, Inc., a wholly owned subsidiary of Appellee Cimarex. Because the parties refer to Prize and Cimarex collectively as "Cimarex," we do so as well.

[4] The basic terms of the proposed acreage swap were (1) Cimarex would convey 640 acres outside of the Lease and (2) BPX would convey 480 acres under the Lease, 20 acres outside of the Lease, and a lump sum payment of $2,100,000 equal to $15,000 per acre for the 140-acre difference.

[5] "Net revenue interest" is the lessee's share of production after all burdens, such as royalties and overriding royalties, have been deducted from the working interest. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 714 n.9 (Tex. 2016) (citing 8 H. WILLIAMS & C. MEYERS, OIL & GAS LAW, MANUAL OF OIL & GAS TERMS, 650 (2015)).

Lease acreage.[6] The difference of 11.5625% equaled the sum of Craddick and Staley's ORRIs, so the offer implicitly required elimination of the ORRIs. After a meeting, BPX sent Cimarex an email suggesting that BPX could only deliver its 75.9375% NRI through an assignment of the Lease but that Cimarex would be able to eliminate the ORRIs by releasing the Lease. BPX's email stated: "If Cimarex acquires the lease via the trade and then allows it to terminate, the overrides and BPX's NRI would be eliminated and Cimarex would end up with [an] NRI of 99.21875%." Cimarex did not respond to this email. Instead, it gave notice that the Lease had terminated for lack of production. It also gave notice of its election to participate in new drilling, expressly reserving its right to claim that the Lease had terminated. Days later, BPX changed course and sent Cimarex a counteroffer to the acreage swap proposal. Instead of conveying the Lease subject to the ORRIs, BPX offered to execute a release of the Lease acreage. On release, the Lease acreage would revert to Cimarex unburdened by Craddick and Staley's ORRIs. Cimarex accepted BPX's offer within days. The parties entered into a letter agreement effective May 1, 2017, finalizing the details of the acreage swap and the form of the release. BPX filed the release in the Reeves County public records on July 7, 2017.

Cimarex, now holding the mineral estate unencumbered by any lease, proceeded to self-develop the subject acreage as an owner-operator by drilling new wells. In late 2018 or early 2019, Craddick realized he had not received an annual payment in 2018 as required by the Lease. After confirming that Staley had similarly not received payment, a representative contacted Cimarex for information. On January 7, 2019, Craddick and Staley first learned that—back in July 2017—BPX had released the Lease and thereby extinguished their ORRIs.

---

[6] The 75.9375% net revenue interest was equal to 100% minus Cimarex's 11.71875% (a 1/8 lessor's royalty minus 1/128 nonparticipating royalty interest), Texas Pacific Land Trust's .78125% (a 1/128 nonparticipating royalty interest), and Craddick and Staley's 11.5625% (ORRIs).

4

### D. Proceedings below

In 2022, Craddick and Staley filed suit against Cimarex and BPX. They asserted breach of contract and bad-faith washout against BPX, and conspiracy against both. They alleged that the Lease's surrender clause was "unique" in requiring BPX to release the Lease, if at all, "in good faith." Cimarex and BPX answered with a general denial and pleaded limitations. Each defendant then filed a Rule 91a motion to dismiss, arguing that Texas does not recognize bad-faith washout and that the surrender clause authorized the 2017 transaction. Cimarex and BPX later contended that they were unable to secure a hearing on those motions.

Craddick and Staley moved for partial summary judgment, arguing that the surrender clause imposed a good-faith duty on BPX to protect their ORRIs. The trial court denied the motion. After discovery, Cimarex and BPX jointly filed a motion for summary judgment on the merits of all claims and limitations. The court granted the motion on the merits of the claims but denied it on limitations. Final judgment was entered that Craddick and Staley take nothing. Craddick and Staley filed a joint notice of appeal, while Cimarex and BPX filed a joint cross appeal.

## II. ISSUES ON APPEAL

Craddick and Staley bring three issues on appeal. The first two challenge the trial court's grant of a take-nothing summary judgment on all their claims and its denial of their motion for partial summary judgment on whether a lessee owes a good-faith duty to an ORRI owner. The third challenges the trial court's striking of their responsive expert testimony on hearsay grounds.

Cimarex and BPX respond on three grounds. First, they maintain the surrender clause allowed BPX to release the Lease at any time and for any reason, without imposing a good-faith duty on the lessee. Second, they urge that bad-faith washout is not a cognizable tort under Texas law. Third, they contend that the conspiracy claim fails without an underlying tort. Moreover, in a

joint cross-appeal, Cimarex and BPX contend the trial court erred in failing to dismiss all claims on limitations grounds.

## III. THE TORT AND CONTRACT CLAIMS

We address the issues in a different order than presented, beginning with the trial court's summary judgment rulings on bad-faith washout, then its ruling on breach of contract, and concluding with its striking of summary-judgment evidence.

### A. Standard of review

We review summary judgment rulings de novo. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013). The movant must show no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; if it does, the nonmovant must raise a fact issue to avoid summary judgment. Tex. R. Civ. P. 166a; *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017) (per curiam).

### B. Property rights and royalty interests

This dispute largely concerns a lessee's right to surrender a lease and the impact upon overriding royalty interests. For context, we define relevant terms as recognized by controlling law. To begin, a mineral lease vests in the lessee both the right and the duty to develop, produce, and market the minerals of the covered acreage. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 49 (Tex. 2017); *Yzaguirre v. KCS Resources, Inc.*, 53 S.W.3d 368, 373 (Tex. 2001).[7] Parties are generally free to determine the lease's terms, and those terms define their

---

[7] The right to develop is one of the five attributes of a mineral estate and the only attribute conveyed by a mineral lease. *Lightning*, 520 S.W.3d at 49. It includes the exclusive right to possess, produce, and dispose of the minerals. *Id.* (citing *Stephens Cnty. v. Mid-Kansas Oil & Gas Co.*, 254 S.W. 290, 293 (Tex. 1923)). A lease imposes corresponding duties in the form of implied covenants to develop the premises, to protect the leasehold, and to manage and administer the lease. *Yzaguirre*, 53 S.W.3d at 373. The duty to manage and administer the lease includes duties to produce and market the minerals. *Id.* (citing *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567 & n.1 (Tex. 1981)). Although the implied duties are real covenants that pass with the leasehold, they are "contractual in nature." *Amoco*, 622 S.W.2 at 571. The right to develop, however, is described as "a property right." *Lightning*, 520 S.W.3d at 49.

respective rights and duties. *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 804 (Tex. 2023). A surrender clause permits the lessee to relinquish the leasehold and it may impose a corresponding obligation to record a written release in the public records. *Ridge Oil Co. v. Guinn Investments, Inc.*, 148 S.W.3d 143, 152 (Tex. 2004); *see Holman v. Meridian Oil, Inc.*, 988 S.W.2d 802, 805 (Tex. App.—San Antonio 1999, pet. denied) (citing cases). An assignment clause permits the lessee to convey the lease to a third party, subject to any restrictions in the clause. *Clayton Williams Energy, Inc. v. BMT O & G TX, L.P.*, 473 S.W.3d 341, 351 (Tex. App.—El Paso 2015, pet. denied). A lessee may assign fractional shares of its leasehold interest, or working interest,[8] such as an ORRI. *Southwestern Energy Production Co. v. Berry-Helfand*, 491 S.W.3d 699, 714 n.9 (Tex. 2016).

An ORRI is recognized as an "interest in the oil and gas produced at the surface, free of production expenses, carved out of the working interest." *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 742 n.2 (Tex. 2020). As a subordinate property interest, it has at least three recognized limitations. First, an ORRI is "necessarily derived from a particular oil and gas lease which constitutes the assignor's mineral estate, and its validity is subject to the terms, conditions and existence of such a lease." *Gruss v. Cummins*, 329 S.W.2d 496, 501 (Tex. App.—El Paso 1959, writ ref'd n.r.e.). "[I]t is the lease which denotes the life and breadth of the estate to be assigned." *Piranha Partners*, 596 S.W.3d at 742 n.2 (quoting *Gruss*, 329 S.W.2d at 501). Second, like other royalty interests, an ORRI is a nonpossessory and nonparticipating property interest. *Ridge Oil*, 148 S.W.3d at 155. In other words, the ORRI owner "has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease." *Id.* Third, an ORRI

---

[8] "Working interest" generally refers to the leasehold interest and is used specifically to refer to the lessee's interest in revenue from production. *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.). "Net revenue interest" refers to the share of revenue that remains after lessors' royalties, ORRIs, and other carve-outs have been deducted from the working interest. *Berry-Helfand*, 491 S.W.3d at 714 n.9.

is limited in duration. "Normally, when an oil and gas lease terminates, the overriding royalty . . . is likewise extinguished." *Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798, 804 (Tex. 1967).

Despite its limited duration, "parties may agree to extend an ORRI beyond the lifetime of a lease." *Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 344 (Tex. 2020). Additionally, to protect an overriding royalty interest from being "washed out" by means of the lessee surrendering the lease or allowing it to lapse and then reacquiring the lease without the interest's burden, parties can include "anti-washout" clauses in a lease. *TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 460 (Tex. 2018) (citing 8 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW, 52, 1129 (2017). The Texas Supreme Court observed in *Yowell* that a party acquiring or reserving an ORRI may prevent washout by means of an anti-washout clause in the instrument creating the ORRI. *Yowell*, 620 S.W.3d at 344. One type of anti-washout clause provides that the ORRI shall be included in extensions, renewals, and new leases. *See id.* Nevertheless, these provisions have limitations. In *Yowell*, for example, the Court found that a new lease provision violated the rule against perpetuities. *Id.* at 341. The Court further explained that, even if such provision were reformed to comply with the rule, it would provide limited security because ORRIs in new leases remain subject to a "triple contingency": the lease terminating, the lessor granting a new lease covering the same mineral interest, and the lessee or its successors acquiring the new lease. *Id.* Though Craddick and Staley did not include new-lease provisions in the assignments creating their interests, they contend the good-faith clause included in the Lease protected their interests from a washout transaction in this case. We turn to examining their claims.

## C. The tort claims

In their first and second issues, Craddick and Staley contend the trial court erred in granting summary judgment in favor of Cimarex and BPX on their bad-faith washout and conspiracy

8

claims, and in denying their own motion for partial summary judgment to the extent it sought affirmative relief on these claims.

### (1) Bad-faith washout

Craddick and Staley contend that a common law duty of utmost good faith and fair dealing exists in oil and gas leasing and limits the power of certain parties to destroy the property interests of overriding royalty owners through a washout transaction. They focus on the guiding principles enunciated by the Texas Supreme Court when it examined similar claims made by NPRI holders. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 83 (Tex. 2015). The Legislature has also weighed in by enacting a statutory cause of action for bad-faith washout in some instances. Tex. Prop. Code §§ 31.001–.005. As an intermediate court of appeals, we are mindful of our institutional limitations, particularly in a domain as commercially significant and heavily regulated as oil and gas. On the record before us, we conclude the evidence does not provide a sufficient basis to recognize for the first time a bad-faith washout claim by an ORRI holder.

### (a) The nature of the bad faith washout claim

In two decisions, the Texas Supreme Court addressed bad-faith washout claims by overriding royalty interest holders. *Sunac*, 416 S.W.2d at 803–04; *Ridge Oil*, 148 S.W.3d at 155. Both decisions are instructive. In *Sunac*, the Court noted there were cases from other jurisdictions that treated a second lease as an extension or renewal of an original lease. 416 S.W.2d at 803. This result followed from the lessee being regarded as a trustee, who was adjudged to hold the overriding royalty in the subsequent lease subject to a constructive trust in favor of the owner of the overriding royalty. *Id*. These cases relied on either (1) specific language in the instrument or (2) the close relationship between the parties shown by the particular facts involved. *Id*. *Sunac* particularly noted these courts had imposed a constructive trust in favor of the owner of an

9

overriding royalty in the event of a "'washout' transaction, generally involving some bad faith on the part of the lessee." *Id*. at 804. "In this type of situation, the operator takes a new lease before the expiration of the old lease and then simply permits the old lease to expire." *Id.* (citing *Oldland v. Gray*, 179 F.2d 408 (10th Cir. 1950)). Distinguishing those cases, the *Sunac* Court explained that the lessee had done neither. *Id.* at 803–04 (noting that "Sunac took a new lease to protect its interest only after the owners of the property raised a question as to the validity of the original 1948 lease"; it did not permit the lease to expire but "made a substantial effort to develop the land . . . by drilling a well" that failed to produce oil). Based on the record of the case, *Sunac* neither reached nor addressed whether Texas law would support a bad-faith washout claim under different circumstances. Our higher court held instead that the lessee did not owe a *fiduciary* duty to the ORRI holder because the lease included a surrender clause disclaiming any implied duty to maintain the lease and an anti-washout provision that was not triggered. *Id.*

The Texas Supreme Court revisited *Sunac's* reasoning in *Ridge Oil*, which involved an analogous type of washout transaction, one similar to the allegations raised in this case. *Ridge Oil*, 148 S.W.3d at 155. The *Ridge Oil* operator deliberately shut off the electricity to two producing wells for 90 days, purportedly to wash out the interest of a co-lessee. *Id*. at 148. The Court declined to recognize bad-faith washout by a co-lessee as "a blanket rule of law." *Id.* In doing so, the Court distinguished co-lessees from ORRI holders, who depend entirely on the lessee to develop the leasehold, but again refrained from indicating whether ORRI holders could assert bad-faith washout. It explained its reasoning as follows:

> Even if such a rule of law might be appropriate in the context of overriding royalty interests when the underlying lease does not contain an express release provision, a question we do not address, there is a material distinction between an overriding royalty interest and that of a lessee. An overriding royalty interest is a non-participating interest. A royalty owner has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease. An

10

> overriding royalty interest owner is wholly dependent on the lessee to keep a lease alive. That is not true of a lessee.

*Id*. at 155. *Ridge Oil* approvingly cited a Fifth Circuit case that rejected a bad-faith claim by an ORRI holder under a farmout agreement, citing *Sunac*. *Id.* at 154 (citing *Matter of GHR Energy Corp.*, 972 F.2d 96, 100 (5th Cir. 1992) (holding the lessee "was free to terminate the leasehold estate" and "cut off" the overriding royalties pursuant to the lease's surrender clause, despite the fact that gas production never ceased)). The Court quoted the Fifth Circuit's caveat stating: "We might well reach a different result if the facts here had suggested that [the lessee] surrendered its interest in the lease to destroy the rights of the overriding royalty interest owner." *Id.* (citing *GHR Energy*, 979 F.2d at 41).

Notably, *Ridge Oil* and *Sunac* both cited a 1932 case rejecting a bad-faith washout claim by the holder of an "oil payment," a type of interest similar to an ORRI.[9] *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 971–73 (Tex. App.—Amarillo 1932, writ ref'd). There, the plaintiff originally held an ORRI but agreed to accept a lump sum and an oil payment as part of a settlement of a lawsuit brought by the lessors alleging termination of the lease. *Id*. at 968. The settlement agreement included a lengthy disclaimer of any implied duty to develop the leases. *Id*. at 971. The lessees deliberately failed to develop the leases so as to permit the leases to expire. *Id*. While the Amarillo Court of Appeals acknowledged the circumstance raised "ethical questions," it held the lessees had exercised their rights in a "business deal in which each party was looking after his own interest in the settlement of their property rights and of a pending lawsuit." *Id.* The court further emphasized that the leases had no ascertainable value, as there was "at most only a

---

[9] "An oil payment is like an overriding royalty. It is carved out of the lessee's share of the oil, the working interest, as distinguished from the lessor's royalty interest. It differs from an overriding royalty only in that it is of limited duration; it expires when the payee receives a fixed amount for his interest." *Standard Oil Co. of Texas v. Marshall*, 265 F.2d 46, 53 (5th Cir. 1959).

faint hope" of production on the leases. *Id.* The Texas Supreme Court refused writ of error*,* suggesting its approval of the holding and that it was not inclined to recognize the existence of a good-faith duty to ORRI holders where the lease included a surrender clause.

Craddick and Staley point out that the Texas Supreme Court has more recently upheld similar claims by holders of NPRIs. *Bradshaw*, 457 S.W.3d at 80 (citing *Schlittler v. Smith*, 101 S.W.2d 543 (Tex. 1937)). Yet an NPRI is different from an ORRI in that an NPRI is carved out of the lessor's mineral estate rather than the lessee's working interest. *Id.* at 75.[10] As a consequence, an NPRI may run with the land while an ORRI generally terminates with the lease. *Yowell*, 620 S.W.3d at 344. Neither interest has the power to execute leases; both are nonparticipating, nonpossessory royalties or shares of gross production that may expire with the lease or otherwise "change depending on the execution and terms of future leases" negotiated by the lessor and lessee. *Id.*

*Bradshaw* recognized that the lessor, as an executive interest holder, has a "fiduciary-like duty of utmost good faith and fair dealing" to the NPRI owner as a non-executive interest holder. *Bradshaw*, 457 S.W.3d at 82. Although it noted that "the contours of the duty remain somewhat indistinct," it explained that the "controlling inquiry" focused on "whether the executive engaged in acts of self-dealing that unfairly diminished the value of the non-executive interest." *Id.* In other words, the executive cannot appropriate the non-executive's interest by signing a new lease decreasing shared benefits in exchange for payment on the side. *Id*. For instance, the plaintiff in

___

[10] *Bradshaw* stated an NPRI is

> an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the [b]onus payable for, or the delay rentals to accrue under oil, gas, and mineral leases executed by the owner of the mineral fee estate.

*Bradshaw*, 457 S.W.3d at 75.

*Bradshaw* had alleged that the executive "misappropriated what would have been a shared benefit (a market-rate royalty interest) and converted it into a benefit reserved only unto itself (an enhanced bonus), with the intent to diminish the value of Bradshaw's royalty interest." *Id.* at 83.

In bringing their washout claim, Craddick and Staley argue that a lessee should be held to the same standard and should not be permitted to appropriate royalty interests carved out of the lessee's interest, i.e. ORRIs, through washout transactions. Cimarex and BPX respond that in traditional parlance, the "executive right" refers only to the mineral estate owner's "power to lease" or "to transfer the development rights of the mineral estate to another." *Id.* at 75 n.1 (citing R. HEMINGWAY, LAW OF OIL AND GAS, § 2.2 (3d ed. 1991)). Craddick and Staley reply that the substance of *Bradshaw* applies equally to the lessee-ORRI holder relationship. *Bradshaw*, they say, traced its recognition of the implied duty to *Andretta v. West,* in which the "executive" amended a mineral lease to grant itself an additional royalty "but neither notified the non-participating royalty interest holder about the amendment nor shared the proceeds." *Id.* at 80 (citing *Andretta v. West*, 415 S.W.2d 638, 641 (Tex. 1967)). The Court thus concluded that an implied duty was necessary "in recognition of the potential for abuse inherent in this division of rights." *Id.* It reasoned, "[i]n the absence of a fiduciary-like duty of utmost good faith and fair dealing, an ill-intentioned or indifferent executive holder could significantly compromise or extinguish the value of a non-executive interest," "appropriating its benefits for himself[.]" *Id.* Craddick and Staley argue that this is precisely what happens when a lessee enters a washout transaction extinguishing an ORRI and increasing the lessee's net revenue interest.

Contrary to Craddick and Staley's reliance on analogous authority, two sister courts of appeals have suggested that bad-faith washout claims by ORRI holders are simply not viable. In *Sasser v. Dantex Oil & Gas, Inc.*, the court affirmed summary judgment against an ORRI holder

13

where the lessor and lessee executed a new lease cutting out the royalty interest holder. 906 S.W.2d 599, 603–05 (Tex. App.—San Antonio 1995, writ denied). The court noted that whether a lease was terminated in good faith or bad faith is "a distinction without a difference." *Id.* at 607. Because "uncontroverted facts" demonstrated that the lease expired by its own terms when production dwindled, the court concluded it did "not believe the Texas Supreme Court would recognize such a duty [of good faith] on the facts before [it.]" *Id.*

Similarly, in *Stroud v. Hosford*, the First Court of Appeals reviewed the pre-*Bradshaw* decisions in detail, concluding: "*Sunac* and *Ridge Oil* indicate that the existence and scope of any duty owed by a lessee to the holder of an overriding royalty interest is an open question under Texas law." *Stroud v. Hosford*, 405 S.W.3d 794, 806 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). The court recognized that *Ridge Oil* and *GHR Energy* "have at least suggested the possibility that a party that engages in conduct to intentionally wash-out an overriding royalty interest may be subject to liability." *Id*. at 811. Consequently, the opinions direct us to "carefully consider the language of controlling documents and the circumstances and relationships of the parties to determine whether any such duty is owed and, thus, whether any actionable wrong has been committed." *Id.* at 806.

*Stroud* held that "based upon the evidence before" it, the ORRI holder did not have a viable claim for intentional termination where the lessee delayed repairing a broken rod on the only producing well until after the lease expired. *Id*. at 811. There was no evidence that the lessee "committed any deliberate act in connection with the breaking of the rod[,]" but there was sufficient evidence to support an implied finding that the lessee "elected not to repair the well so that the B & G leases would expire[.]" *Id.* at 803. A lengthy dissent argued the majority went beyond *Sunac* by denying recovery in the case of intentional termination. *Id.* at 814 (Keyes, J.,

14

dissenting). Still, *Stroud's* majority pointed out that "there were no surrender clauses in the B & G leases, appellees have not cited anything in the assignments of the overriding royalty interests or the B & G leases that obligated the Stroud defendants to repair the polished rod on the broken well or take other action to perpetuate the B & G leases." *Id.* at 810. *Stroud* also noted, on a procedural matter, that the ORRI owner failed to appeal a directed verdict on claims of breach of a duty of good faith and fair dealing and a duty to develop the leasehold. *Id.* at 810 n.12. The court accordingly concluded that "there [was] no evidence that the Stroud defendants violated any express or implied contractual duty and there [was] no evidence of the existence of a fiduciary or confidential relationship." *Id.* at 811.

### (b) The limited record here

Generally, when considering whether to recognize a legal duty in tort, courts look to various factors: "the foreseeability and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993) (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)); *Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 583 (Tex. 2023). Texas law generally does not impose a broad duty of good faith between contracting parties. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 490 (Tex. 2019). Moreover, Texas's economic loss rule reflects that not all economic harms have corresponding legal remedies, particularly in tort. *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 235 (Tex. 2014). The Supreme Court reiterated these principles by acknowledging that whether to recognize a new duty owed "involves complex considerations of public policy" that "include 'social, economic, and political questions,' and their application to the particular facts at hand." *Graff*, 858 S.W.2d at 920.

15

Exercising a policymaking role, the Legislature has recently addressed this very issue. In 2023, Chapter 31 of the Texas Property Code was enacted, creating a statutory cause of action for bad-faith washouts. *See* Act of April 27, 2023, 88th Leg., R.S., ch. 7, § 1, secs. 31.001–.005, 2023 Tex. Sess. Law Serv. 11, 11 (codified at Tex. Prop. Code §§ 31.001–.005). This development followed earlier legislative efforts, including House Bill 4218 in 2021, which was vetoed by Governor Abbott on freedom of contract grounds. *See* Veto Message of Gov. Abbott, Tex. H.B. 4218, 87th Leg., R.S. (2021). The veto underscored the competing policy concerns at stake.

Nonetheless, the parties agree in this instance that Craddick and Staley cannot rely on the 2023 statute, which applies only to challenged transactions occurring after its effective date. Tex. Prop. Code § 31.001–.005 (effective Sept. 1, 2023). As BPX notes, the bill was filed by Craddick, in his capacity as a member of the Texas Legislature, after this suit was commenced. BPX does not contend that the statute displaces any common-law claim, and the statute itself provides that it is "cumulative of other remedies provided by common law." *Id.* § 31.004(b). A statement of intent filed by Craddick explained that "Texas courts have repeatedly looked at the concept of a 'bad faith washout' of royalty owners' rights" in a manner that such conduct is "adverse to basic contract tenets and fairness," and that "[w]hile the courts keep seeing these types of situations, they have repeatedly stated it is hard to identify and hard to prove without legislative guidance." Bill Analysis: Author's Statement of Intent, Tex. H.B. 450, 88th Leg., R.S. (Apr. 14, 2023). On its face, the statute does not purport to overrule existing case law but appears instead to clarify the fact-bound holdings of *Stroud*, *Sasser*, and *Sunac*. For our purposes, the statute alone does not establish a basis to recognize a common-law duty of good faith. *See Graff*, 858 S.W.2d at 920.

Craddick and Staley urge the Court to look to *Tidelands Royalty "B" Corp. v. Gulf Oil Corp.*, 804 F.2d 1344 (5th Cir. 1986), as persuasive authority that was decided against a similar statutory backdrop. *Tidelands* applied Louisiana law, under which Mineral Code Article 109 codifies a good-faith duty owed by executives to non-executive royalty owners. Although Article 109 did not squarely govern the lessee-ORRI holder posture before it, the Fifth Circuit concluded that the principles underlying the executive/non-executive relationship applied: in both, one party holds the exclusive right to develop while the other holds only a passive interest dependent on that development. *Id.* at 1350–52. Building on *Tidelands*, Craddick and Staley contend that *Bradshaw* "changed the landscape" of Texas law by recognizing a similar duty to non-executive royalty owners, eliminating any meaningful distinction between ORRIs and NPRIs for purposes of the duty analysis. Although Craddick and Staley acknowledge that *Bradshaw* involved an NPRI, they contend its rationale applies equally to an ORRI because both are non-executive interests "equally susceptible to potential self-dealing by an executive." On review of the record and arguments presented here, we are not persuaded that *Bradshaw* extends a bad-faith washout claim to ORRIs.

*Bradshaw* synthesized prior cases and clarified the standard for breach of the executive's duty to the non-executive: "whether the executive engaged in acts of self-dealing that unfairly diminished the value of the non-executive interest." *Texas Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 654 (Tex. 2019) (quoting *Bradshaw*, 457 S.W.3d at 82). As Craddick and Staley acknowledge, the executive duty was first recognized long before, in *Schlittler*, 101 S.W.2d at 545. And as early as 1932, the Supreme Court declined to recognize a lessee's duty to an ORRI owner. *Montgomery*, 49 S.W.2d at 973. Throughout this line of cases, the "executive" has meant the lessor, not the lessee, and the duty has been owed only to NPRI or non-executive mineral interest owners, not to

ORRI owners. *Bradshaw*, 457 S.W.3d at 80–83, 85 (noting that the "lessee's interests are inherently adverse to both the executive and a non-executive interest holders").

In *Barrow-Shaver*, the Court summarized the categories of oil and gas contracts that give rise to a duty of good faith. 590 S.W.3d at 490. A duty of good faith "may arise when the contract governs or creates a special relationship. *Id.* The duty "stems from the relationship of the parties and not from the contract" that created the relationship. *Id.* Contracts that create special relationships "include contracts between executive-right holders and non-participating royalty-interest owners, as well as contracts between working-interest owners and royalty owners." *Id.* The Court declined to recognize a duty to an ORRI owner in the context of a farmout agreement because such agreements do not create "inherently unequal bargaining power or give one of the parties an opportunity to take advantage of the other, especially when both parties are highly sophisticated oil and gas entities." *Id.* The Court emphasized that both parties were "sophisticated oil and gas entities that had representatives with extensive experience in the oil and gas industry." *Id.* at 484, 490, 493, 495. As in *Sunac*, the Court's analysis suggests that any duty owed to an ORRI holder would require evidence of a relationship between the parties beyond an arm's length sale of an oil and gas lease. *Sunac*, 416 S.W.2d at 803; *see also Pitts v. Rivas*, 709 S.W.3d 517, 533 n.5 (Tex. 2025) (Huddle, J., concurring) (citing *MacDonald v. Follett*, 180 S.W.2d 334, 338 (Tex. 1944)), for the proposition that a constructive trust was appropriate when a joint venturer abused a "relation of trust and confidence" regarding ORRIs).

As relevant here, we do not rule out the possibility that a duty of good faith in this context might be appropriate under some set of facts, or that a more complete record might support a different result. But here, the record on which Craddick and Staley would have us recognize a duty owed to ORRI holders is thin, it consists principally of the Lease, the lease assignments reserving

18

their ORRIs as well as documents exchanged between the parties. The assignment includes a renewal-or-extension provision, which *Sunac* found insufficient to perpetuate an ORRI. *Sunac*, 416 S.W.2d at 803. The assignment was then separated from the conveyance to BPX by "numerous intermediate assignments": from Craddick to NRM; from NRM to Staley Gas Co., Inc.; from Staley Gas Co., Inc. to George Staley by means not shown in the record; and from George Staley to an affiliate of BPX in 2014. *Id.* at 804. There is no evidence of a close relationship between Craddick and BPX, nor Craddick and Cimarex, of the kind *Sunac* described.[11] Sandra Staley's ORRI, which she acquired from her husband, George Staley, upon his death, was reserved in Staley's assignment and contains no anti-washout language. George Staley died more than a year before the alleged washout transaction occurred, and there is no evidence of a relationship or any communication between either George or Sandra Staley and BPX or Cimarex.[12] Craddick and Staley do not dispute that they were sophisticated participants in the oil and gas industry. *Barrow-Shaver*, 590 S.W.3d at 490. Neither Craddick nor Staley offer any evidence as to whether owners of ORRIs, as opposed to NPRIs, are more or less susceptible to an "inherently unequal bargaining power." *Id.* Nor does the record address what social and economic effects on the oil and gas industry would result from recognizing a duty to ORRI owners. *See Graff*, 858 S.W.2d at 920.

---

[11] We further note that the acreage swap does not fit the washout pattern *Sunac* described, in which "the operator takes a new lease before the expiration of the old lease and then simply permits the old lease to expire." 416 S.W.2d at 804. BPX did not take a new lease, and Cimarex, as mineral owner, developed the acreage itself rather than through a successor lease. Craddick and Staley contend this difference cuts the other way, pointing to BPX's March 2017 email as evidence of a deliberate washout scheme rather than a mere expiration of the lease. Whether the structure of the acreage swap supports their claim or the defense, the basis for liability remains the lessee's relationship with the ORRI holder—and on that point, the record here is no stronger than the record *Sunac* found insufficient. *Id.*

[12] We have previously held that a claim against Sandra Staley, as executrix of George Staley's estate, could not proceed where the estate's well-interest derived from George's farmout with a third-party owner-operator and Sandra had no direct relationship with the claimant giving rise to personal liability. *See Nova Mud, Inc. v. Staley*, 583 S.W.3d 728, 737 (Tex. App.—El Paso 2019, pet. denied) (noting that the estate's interest was "entirely derivative" of the owner-operators' interest and that the claimant had "no claims against Staley *in personam*") (emphasis in original).

On the limited evidence and arguments presented here, we are not persuaded this is the appropriate case or forum to recognize a cause of action for bad-faith washout of an overriding royalty interest.

### (2) Conspiracy

Because conspiracy is a derivative tort that "depends on participation in some underlying tort," we also conclude the trial court correctly granted summary judgment on the conspiracy claim against defendants given the failure of plaintiffs' underlying tort claims. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

### (3) Summary

In sum, we overrule Craddick and Staley's first and second issues in part and to the extent they implicate tort claims.

### D. Breach of contract

In the remaining part of their first and second issues, Craddick and Staley contend the trial court erred in granting summary judgment in favor of BPX on their breach of contract claim. They urge that BPX violated a lease term to the extent the surrender clause obligated BPX to release the Lease "in good faith." After pointing out that Craddick and Staley are not actual parties to the Lease, BPX responds that the surrender clause negates any implied duty of good faith, in the same manner as the surrender clause in *Sunac*. Replying, Craddick and Staley urge that it is an "atypical," "incredibly unique" surrender clause that prohibited BPX from surrendering the Lease in bad faith. Because the clause neither authorizes nor limits the ability of BPX to surrender the Lease, we conclude it merely sets forth a recordkeeping obligation.

Standard rules of contract interpretation apply to the interpretation of an oil-and-gas lease. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). If an

20

instrument is worded in such a way that it can be given a certain or definite meaning, it is not ambiguous. *Id*. at 601. Texas courts thus recognize that ambiguity does not arise merely because parties assert differing interpretations. *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016). Whether a contract is ambiguous is a question of law reviewed de novo. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018).

When interpreting a contract such as a lease, our primary intent is to ascertain the intent of the parties from all the language found in the four corners of the instrument itself. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). We examine the entire instrument, seeking to harmonize and give effect to each provision so that none are rendered meaningless. *Id*. at 462. To discern intent, we construe words and phrases together and in context, not in isolation. *Hysaw v. Dawkins*, 483 S.W.3d 1, 13 (Tex. 2016). Finally, we consider the entire contract and resolve any conflicts by harmonizing the provisions, where possible, "rather than by applying arbitrary or mechanical default rules." *Piranha Partners*, 596 S.W3d at 744 (citing *Wenske v. Ealy*, 521 S.W.3d 791, 792, 796 (Tex. 2017)).

> Focusing closely on the pertinent lease language, the surrender clause provides as follows:
>
> It is hereby agreed and understood that in the event that Lessee or his assigns, by reason of failure to find oil in paying quantities, or for other reasons, desires the cancellation of this lease, or any part thereof, that they will in good faith have made out and delivered promptly to the Lessors or their General and State Agent at Dallas, Texas, such release or cancellation paper as that, when placed upon the county records, will remove any cloud or lien upon Lessors title to the land released in the event the record of the lease had placed any such cloud or lien upon same.

Read in its entirety, the clause at issue (1) provides the lessee the right to surrender the Lease for various reasons and (2) defines further obligations owed to the lessor once the lessee exercises its surrender right. In other words, if BPX desired to cancel the Lease, then it had a good-faith duty to promptly draft and deliver a release capable of clearing Cimarex's title. Although the

21

clause includes the phrase "in good faith," it does not set forth a covenant to act in good faith in all aspects. The phrase only modifies the verb phrase "made out and delivered promptly . . . ."

Craddick and Staley argue that it is implausible that any lease would impose a good-faith duty on the mere delivery of a release. But as the Third Court of Appeals explained, such a provision was important to lessees at the time. *Wheelock v. Batte*, 225 S.W.2d 591, 597 (Tex. App.—Austin 1949, writ ref'd n.r.e.). While the Legislature had not—and still has not— enacted a statute regarding releases of oil and gas leases, "at least 34 of the states have passed laws requiring, under penalty, the release of record of liens and other encumbrances after satisfaction or discharge[.]" *Id.* "[U]nder such statutes one is not bound at his peril to determine disputed or doubtful questions concerning the validity of his lien or lease and that good faith in refusing to release may be shown as a defense to suits under such statutes." *Id.* The court held that "lack of good faith must be shown in a suit for damages for refusal to execute a recordable release of an oil and gas lease." *Id.*

Applying our contract interpretation principles, the good-faith provision in the surrender clause here is simply a "release of record clause." 4 H. WILLIAMS & P. MEYERS, OIL AND GAS LAW § 679 (2024). Such a clause may be triggered by surrender for any reason, whether or not the surrender violates other lease terms. *See, e.g.*, *Vermillion FC, LP v. 1776 Energy Partners, LLC*, No. 04-20-00089-CV, 2021 WL 3743514, at *10 (Tex. App.—San Antonio Aug. 25, 2021, no pet.) ("In the event this Lease expires *for any reason* . . . Lessee . . . shall be obligated to furnish Lessor with a written, recordable release instrument . . . of said land within ninety (90) days of such expiration." (emphasis added)); *Holman v. Meridian Oil, Inc.*, 988 S.W.2d 802, 806 (Tex. App.— San Antonio 1999, pet. denied) (requiring delivery of "any release").

Other clauses in the Lease demonstrate the lessor's focus on centralized recordkeeping. In addition to requiring written releases, the lessee is required to deliver to the General and State Agent of the Texas Pacific Land Trust detailed monthly production reports, affidavits as to completion of producing wells, and complete certified copies of assignments including names and addresses. The Lease begins unceremoniously: "FOR the purpose of uniformity it is requested that in the future wells drilled upon our properties be designated by the Suffix 'TXL,' i.e. 'TXL 1, 2', Etc., or 'TXL A-1, A-2', Etc. This request is made for the reason that in the past wells have been named for various individuals, thereby often times causing confusion in scout and field reports." Reading the Lease as a whole, we disagree with Craddick and Staley that it is simply not plausible that the parties would impose a good-faith duty to deliver a formal release in a prompt and effective manner. For all these reasons, we overrule the remaining part of Craddick and Staley's first and second issues to the extent they address their breach of contract claim against BPX.

### E. The striking of the expert report on damages

In their third issue, Craddick and Staley argue the trial court erred in striking as hearsay their expert report on damages. Any error was harmless. Summary judgment was granted on liability grounds, making the damages report irrelevant to the disposition. *See* Tex. R. App. P. 44.1(a) (requiring harmful error for reversal). We overrule Craddick and Staley's third issue.

## IV. LIMITATIONS

In their cross-appeal, Cimarex and BPX contend that Craddick and Staley's claims are all barred by the applicable statute of limitations. Because we determined that none of the claims are actionable, there is no need for us to reach the cross-appeal on limitations. *See* Tex. R. App. P. 47.1.

23

## V. CONCLUSION

We affirm the judgment of the trial court in its entirety.

GINA M. PALAFOX, Justice

May 28, 2026

Before Salas Mendoza, C.J., Palafox, and Soto, JJ.